**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CUMBERLAND CASUALTY & SURETY COMPANY,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 94-366C** |
| | ) | **(Judge Merow)** |
| **THE UNITED STATES** | ) | |
| **Defendant.** | ) | |

## APPENDIX

## TABLE OF EXHIBITS:



| Ex. #/Tab | Contents | Page Number |
|---|---|---|
| 1. | Complaint | 1 |
| 2. | Answer | 12 |
| 3. | Takeover Agreement | 19 |
| 4. | Nov. 20, 2002 Decision of the ASBCA in the AEC action | 23 |
| 5. | Cumberland's Request for a Contracting Officer's Final Decision | 32 |
| 6. | August 14, 1998 Decision of the ASBCA | 45 |
| 7. | Government's Appeal to the United States Court of Appeals for the Federal Circuit | 93 |
| 8. | Decision of the United States Court of Appeals for the Federal Circuit | 95 |
| 9. | Contracting Officer's Final Decision | 109 |
| 10. | Order Staying Cumberland Action | 119 |

| | | |
|---|---|---|
| 11. | Order Re-opening Fact Discovery | 120 |
| 12. | Contract between AEC and the Government, section § 01011, ¶ 5 | 122 |

RECEIVED
JUN 3 1994
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CUMBERLAND CASUALTY & SURETY COMPANY, Plaintiff, | |
| v. | Case No.________ |
| UNITED STATES OF AMERICA, Defendant. | |

**COMPLAINT**

COMES NOW the Plaintiff, Cumberland Casualty & Surety Company ("Cumberland"), by counsel, and hereby asserts the following causes of action against the Defendant, the United States of America:

**JURISDICTION AND PARTIES**

1. This Court has jurisdiction over this matter pursuant to the Contract Disputes Act, 41 U.S.C. § 601 et seq., and the Tucker Act, 28 U.S.C. §1491, et seq.

2. Plaintiff Cumberland is a corporation organized and existing under the laws of the State of Florida with its principal place of business located in Tampa, Florida.

3. Defendant is the United States of America acting by and through the Naval Facilities Engineering Command of the United States Navy (the "Navy").

**BACKGROUND**

4. In or about August, 1989, the Navy issued notice to AEC Corporation ("AEC") that it was eligible to be awarded a

EXHIBIT 1

Contract through the Small Business Administration ("SBA") for the construction of a Naval and Marine Corps Reserve Training Center in Miami, Florida (the "Project"). Thereafter, the SBA entered into a $4.4 million contract with the Navy for the performance of the Project and assigned this Contract to AEC (the "Prime Contract").

5. Pursuant to the Prime Contract terms and conditions and the controlling regulations, AEC was required to provide payment and performance bonds in accordance with the Miller Act, 40 U.S.C. §270a et seq. AEC requested Surety Specialists, Inc. ("Surety Specialists") and Kimmins Contracting Corp. ("Kimmins") to assist in obtaining the requisite bonds.

6. On August 16, 1989, AEC entered into an agreement with Surety Specialists and Kimmins pursuant to which Surety Specialists and Kimmins agreed to provide the requisite Miller Act payment and performance bonds under the Contract for the performance of the Project. Pursuant to the August 16, 1989 Agreement, Cumberland issued the Miller Act bonds as the Surety on the Project.

7. The August 16, 1989 Agreement established a Project bank account in which all payments made by the Navy to AEC in connection with the Project were to be deposited for the protection of Cumberland as Surety. AEC provided notice to the Navy of the terms and conditions of the August 16, 1989 Agreement and directed the Navy to deposit all payments made under the Contract in the Project bank account.

8. AEC commenced performance of the Project on or about September 4, 1989.

9. As a result of various Navy changes and delays to the performance of the Project, AEC was unable to complete the work at the scheduled time. In addition, the Navy issued change orders to AEC's contract after the scheduled contract completion date without providing AEC with corresponding extensions of time for the performance of the additional work. On December 31, 1990, and again on March 20, 1991, the Navy issued show cause notices to AEC demanding that AEC demonstrate why the Navy should not terminate the Contract for, among other things, AEC's failure to make progress. Thereafter, on April 22, 1991, the Navy terminated AEC's Contract for default. The propriety of the Navy's termination of AEC for default is being challenged before the Armed Services Board of Contract Appeals in the Appeal of AEC Corp., ASBCA No. 42920.

10. The Navy made demand upon Cumberland, as the Miller Act Surety, for the completion of the Project in accordance with Cumberland's Performance Bond obligations.

11. On May 2, 1991, Cumberland entered into a Takeover Agreement with the Navy for the completion of the Project.

12. Pursuant to the Takeover Agreement, Cumberland completed the Contract work in or about October, 1991, reserving its right to assert claims against the Navy for equitable adjustment and the Navy's abuse of discretion.

13. As a result of Cumberland's satisfaction of its Performance Bond obligations, Cumberland is equitably subrogated to the rights of AEC and the Navy under the terms of the Contract and has a priority right to recover the Contract balances.

14. On September 3, 1992, Cumberland submitted a certified claim under the Contract Disputes Act, 41 U.S.C. § 601 et seq. for an equitable adjustment and compensable extensions of time in the amount of $1,264,750.91 and requested a Contracting Officer's Final Decision.

15. On or about October 12, 1993, Cumberland received the Contracting Officer's Final Decision #93-2, Serial Letter 111F/93-111-206 signed by William C. Timperley, denying each of Cumberland's claims, with the exception of a claim for $1,026 in additional costs for wiring the motor of exhaust fan #15.

## COUNT I

## (Equitable Subrogation/Abuse of Discretion)

16. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 15, inclusive, as though fully set forth herein.

17. Pursuant to AEC's direction to the Navy and the Navy's actual knowledge of and acquiescence to the terms and conditions of the August 16, 1989 Agreement, the Navy was to deposit all progress payments payable to AEC in a Project bank account.

18. The Navy deposited AEC's progress payments into the designated Project bank account from commencement of the Project work until in or about November, 1990.

19. In November, 1990, the Navy improperly deposited a Project progress payment in the amount of $106,000 into an unauthorized bank account without the knowledge or approval of Kimmins or Cumberland .

20. As a result of the Navy's improper disbursement of the Contract funds to an unauthorized bank account, the amount of $106,000 was not available to Cumberland for the completion of the Project.

21. The Navy grossly and flagrantly abused its discretion by depositing the Progress payment in an unauthorized account.

22. As a result of the Navy's abuse of discretion, Cumberland has suffered a loss in the amount of $106,000.

WHEREFORE, Cumberland respectfully requests this Court to enter judgment against the United States in the amount of $106,000.00, plus statutory interest pursuant to 41 U.S.C. §601 et seq. from the date of Cumberland's certified claim, in addition to Cumberland's attorneys' fees and costs and such other and further relief as this Court may deem just and proper.

**COUNT II**

**(Equitable Subrogation/Abuse of Discretion)**

23. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 22 inclusive as though fully set forth herein.

24. Pursuant to the Contract terms, the Navy was required to review the Contract work and make progress payments to AEC based upon the status and percentage of work completed. Consequently, the Navy knew or should have known that AEC had

invoiced for amounts in excess of the actual percentage of the work completed or performed in accordance with the terms and conditions of the Contract.

25. The Navy made gross overpayments to AEC in the amount of $453,811.31 for work which the Navy alleged was either not complete or not performed in accordance with the terms and conditions of the Contract.

26. The Navy's gross overpayments to AEC was for, among other things, the following items of work: (a) sitework; (b) aluminum railings; (c) concrete entrance/stairs; (d) electrical work; (e) pest control; (f) repair of stair nosings; and (g) interior and exterior painting.

27. As a result of the Navy's improper disbursement of the Contract funds, the amount of $453,811.31 was not available to Cumberland for the completion of the Project.

28. The Navy grossly and flagrantly abused its discretion by improperly disbursing the Contract Progress Payments in violation of the Contract terms and conditions.

29. As a result of the Navy's abuse of discretion, Cumberland has suffered a loss in the amount of $453,811.31.

WHEREFORE, Cumberland respectfully requests this Court to enter judgment against the United States in the amount of $453,811.31, plus statutory interest pursuant to 41 U.S.C. §601 et seq. from the date of Cumberland's certified claim, in addition to Cumberland's attorneys' fees and costs and such other and further relief as this Court may deem just and proper.

**COUNT III**

**(Pro tanto Discharge)**

30. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 29 by reference, inclusive, as though fully set forth herein.

31. As a result of the Navy's abuse of discretion and improper payments to AEC, the Plaintiff was discharged pro tanto from its Performance Bond obligations.

32. The Plaintiff is entitled to recover its costs incurred in the completion of the Project to the extent that it was damaged by the Navy's abuse of discretion.

WHEREFORE, Cumberland respectfully requests this Court to enter judgment against the United States in the amount of $559,811.31 plus statutory interest pursuant to 41 U.S.C. §601 et seq. from the date of Cumberland's certified claim, in addition to Cumberland's attorneys' fees and costs and such other and further relief as this Court may deem just and proper.

**COUNT IV**

**(Equitable Adjustment)**

33. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 32 by reference, inclusive, as though fully set forth herein.

34. The Takeover Agreement between Cumberland and the Navy incorporated the Prime Contract terms and conditions.

35. The Prime Contract incorporated Federal Acquisition Regulation ("FAR") § 52.243-4, "Changes (AUG 1987)" which provided in pertinent part:

> (d) [i]f any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing.

36. During Cumberland's completion of the Project, the Navy demanded that Cumberland perform additional work and changes beyond the scope of the Contract which included the following:

(a) correcting the existing floor slab of the quarry tile;

(b) providing insulation of the gas line at the desuperheater;

(c) providing admixture to concrete for the assembly hall floor;

(d) changing the oil fired water heaters to electric water heaters;

(e) replacing cracked concrete stairs on the west side of building and reinstalling stairs without expansion joint;

(f) wiring motor for exhaust fan #15;

(g) providing condensate lines at fan coil units;

(h) replacing keying schedule;

(i) repairing the fire line loop and asphalt, sidewalks and other areas;

(j) reseeding and adding sod to areas on east and west side of building;

(k) replacing recessed fire extinguisher cabinets;

(l) replacing dielectric union at chillers;

(m) installing two fire dampers; and

(n) providing additional insulation for building.

37. The Navy has failed to pay Cumberland for the costs incurred in the performance of the additional work directed by the Navy in contravention of the Contract's "Changes" clause.

38. In addition, Cumberland's performance was extended due to the numerous Navy changes and delays resulting in Cumberland's incurrence of extended overhead costs.

39. As a result of the Navy's changes and delays, Cumberland has incurred additional costs in the amount of $285,871.18 and is entitled to an equitable adjustment and compensable time extensions.

WHEREFORE, Cumberland respectfully requests this Court to enter judgment against the United States in the amount of $285,871.18, plus statutory interest pursuant to 41 U.S.C. §601 et seq. from the date of Cumberland's certified claim, in addition to Cumberland's attorneys' fees and costs and such other and further relief as this Court may deem just and proper.

**COUNT V**

**(Remission of Liquidated Damages)**

40. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 39 by reference, inclusive, as though fully set forth herein.

41. As a result of the Navy's actions and for reasons beyond Cumberland's control and without its fault or negligence, Cumberland's performance was excusably and compensably delayed.

42. Cumberland has completed the Contract work in accordance with the Contract requirements and is entitled to time extensions for the completion of the Contract.

43. The Navy improperly and wrongfully withheld $419,068.42 from payment to Cumberland and has demanded an additional $65,322.58 for liquidated damages for Cumberland's alleged failure to complete the Project timely.

44. Cumberland is entitled to receive the remission of all liquidated damages in the amount of $419,068.42 improperly withheld and to receive time extensions through the completion of the Contract.

WHEREFORE, Cumberland respectfully requests this Court to enter judgment against the United States in the amount of $419,068.42, plus statutory interest pursuant to 41 U.S.C. §601 et seq. from the date of Cumberland's certified claim, in addition to Cumberland's attorneys' fees and costs and such other and further relief as this Court may deem just and proper.

**COUNT VI**

**(Breach of Contract)**

45. Plaintiff hereby incorporates by reference the allegations set forth in paragraphs 1 through 44, inclusive, as though fully set forth herein.

46. The Navy's actions as alleged in Counts I through V, taken in their entirety constitute a material breach of the Takeover Agreement and Contract.

47. As a result of the Navy's material breach of Contract, Cumberland has incurred substantial damages.

WHEREFORE, Cumberland respectfully requests this Court to enter judgment against the United States in the amount of $1,264,750.91, plus statutory interest pursuant to 41 U.S.C. §601

et seq. from the date of Cumberland's certified claim, in addition to Cumberland's attorneys' fees and costs and such other and further relief as this Court may deem just and proper.

Dated: June 3, 1994.

Respectfully submitted,

COUNSEL FOR THE PLAINTIFF
CUMBERLAND CASUALTY & SURETY
COMPANY

Barbara G. Werther

Barbara G. Werther
WATT, TIEDER & HOFFAR
7929 Westpark Drive, Suite 400
McLean, Virginia 22102
(703) 749-1000

9/16/94

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CUMBERLAND CASUALTY & SURETY COMPANY,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 94-366C<br>(Judge Tidwell) |

SEP 16 1994

DEFENDANT'S ANSWER

For its answer to the complaint, defendant respectfully admits, denies and alleges as follows:

The first unnumbered paragraph of plaintiff's complaint requires no answer.

1. Paragraph 1 is a statement of jurisdiction, to which no response is required; to the extent a response is required, these allegations are denied.

2. Denies the allegations contained in paragraph 2 for lack of knowledge or information sufficient to form a belief as to their truth.

3. Admits.

4. Admits.

5. Admits.

6. Admits.

7. Denies the allegations contained in the first sentence for lack of knowledge or information sufficient to form a belief as to their truth. Denies the allegations contained in the second sentence.

WT & H
Rec'd on 9/16 BY
Copies to:

EXHIBIT
2

8. Admits.

9. Denies the allegations contained in the first sentence of paragraph 9. Denies the allegations contained in the second sentence of paragraph 9. Admits the allegations contained in the fourth sentence of paragraph 9. Admits the allegations contained in the fifth sentence of paragraph 9.

10. Admits.

11. Admits.

12. Paragraph 12 is admitted to the extent that Cumberland completed the contract work on or about October 1991; however, defendant denies that the Navy reserved Cumberland's right to appeal because of the Navy's abuse of discretion.

13. The allegations contained in paragraph 13 calls for a legal conclusion which requires no response; to the extent a response is required, those allegations are denied.

14. Denies.

15. Admits the allegations contained in paragraph 15 to the extent that the final decision (#93-2) of the contracting officer was issued on October 7, 1993. Denies the allegations concerning the date of receipt of such document by Cumberland for lack of knowledge or information sufficient to form a belief as to their truth. Admits the allegations as to the contents of the final decision to the extent supported by the document, which is the best evidence of its contents.

16. Defendant incorporates by reference its responses to paragraphs 1-15.

17. Denies.

18. Denies.

19. Denies.

20. Denies.

21. Denies.

22. Denies.

The allegations contained in the last unnumbered paragraph of Count I of the complaint is Cumberland's prayer for relief to which no response is required; to the extent a response is required, these allegations are denied.

23. Defendant incorporates by reference, its responses to paragraphs 1-22.

24. Admits the allegations contained in the first sentence of paragraph 24. Denies the allegations contained in the second sentence.

25. Denies.

26. Denies.

27. Denies.

28. Denies.

29. Denies.

The allegations contained in the last unnumbered paragraph of Count II is Cumberland's prayer for relief which requires no response; to the extent a response is required, the allegations are denied.

30. Defendant incorporates by reference its responses to paragraphs 1-29.

31. Denies.

32. Denies.

The allegations contained in the last unnumbered paragraph of Count III is Cumberland's prayer for relief which requires no response; to the extent a response is required, such allegations are denied.

33. Defendant incorporates by reference its responses to paragraphs 1-32.

34. Admits the allegations of paragraph 34 to the extent supported by the takeover agreement, which is the best evidence of its contents.

35. Admits the allegations of paragraph 35 to the extent supported by the prime contract, which is the best evidence of its contents.

36. Denies.

37. Denies.

38. Denies.

39. Denies.

The last unnumbered paragraph in Count V is Cumberland's prayer for relief, to which no response is required; to the extent a response is required, these allegations are denied.

40. Defendant incorporates by reference its responses to paragraphs 1-39.

41. Denies the allegations contained in paragraph 41 for lack of knowledge or information sufficient to form a belief as to their truth.

42. Denies.

43. Denies.

44. Denies.

The last unnumbered paragraph of the complaint is Cumberland's prayer for relief which requires no response; to the extent a response is required, these allegations are denied.

45. Defendant incorporates by reference its responses to paragraphs 1-44.

46. Denies.

47. Denies.

The allegations contained in the last unnumbered paragraph of Count VI is Cumberland's prayer for relief, which requires no response; to the extent a response is required, these allegations are denied.

48. Denies each and every allegation not previously admitted or otherwise qualified.

WHEREFORE, defendant requests that the complaint be dismissed and that defendant be granted such other and further relief as the Court may deem just and proper.

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

David M. Cohen
DAVID M. COHEN
Director

George M. Beasley III

GEORGE M. BEASLEY, III
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
2nd Floor, Todd Building
Washington, D.C. 20530
Tele: (202) 514-4325

Attorneys for Defendant

OF COUNSEL:

AUDREY VAN DYKE
Senior Trial Attorney
Naval Facilities Engineering Command
Department of the Navy
901 M Street, S.E.
Washington, D.C. 20374

SEPTEMBER 16, 1994

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 16th day of SEPTEMBER 1994, I caused to be placed in the United States mail (first class, postage-prepaid) "DEFENDANT'S ANSWER" addressed as follows:

Barbara G. Werther, Esq.
WATT, TIEDER & HOFFAR
7929 Westpark Drive, Suite 400
McLean, VA 22102

Vera M. Diggs

# TAKEOVER AGREEMENT

CONTRACT N62467-91-C-0701

This Takeover Agreement is for completion of defaulted Contract N62467-88-C-0646.

This Agreement is entered into this 2nd day of May 1991, by and between Cumberland Casualty & Surety Company, a corporation of the State of Florida, with its principal place of business at P. O. Box 5098, Tampa, FL 33675-5098 (hereafter "Surety") and the United States of America as represented by the Department of the Navy (hereafter "Government").

WITNESSETH:

WHEREAS the Government entered into Contract N62467-88-C-0646 with AEC Corporation for the performance of this contract for the construction of Reserve Training Center, Naval and Marine Corps Reserve Center, Miami, Florida; and

WHEREAS AEC Corporation was declared by the Government to be in default in the performance of its obligations under the contract and its right to proceed with the work was terminated by the Government; and

WHEREAS the Surety, by its Performance Bond, assumed certain obligations if the contractor failed to perform in accordance with the contract; and

WHEREAS the Government made demand upon the Surety for completion of the work in accordance with the Surety's obligations under its Performance Bond; and

WHEREAS, with a full reservation of its rights, remedies, and defenses, the Surety has advised the Government that it will undertake the completion of the work and will contract for completing the work in accordance with the terms and conditions of the terminated contract;

NOW, THEREFORE, in consideration of their mutual promises, the parties agree as follows:

1. The Surety will perform or procure the performance of all work and other obligations of the defaulted contract not presently completed or fulfilled, including the correction and repair of all defective workmanship. The provisions and clauses of the defaulted contract, the contract plans and specifications, and the Performance and Payment Bonds, are incorporated into this Agreement.

2. The Government represents that $671,044.42 is the unpaid contract balance, including retainages. The Surety reserves the right to challenge the accuracy of the amount of the contract balance when adjusted for all change orders, field orders, and any other extra work required under the contract. The Surety shall be paid in accordance with and in the manner provided by the defaulted contract, subject to the following conditions:



EXHIBIT
3

a. The Government asserts the right to off-set the unpaid contract balance by any withholding directed by the Department of Labor pursuant to the Davis-Bacon Act or the Service Contract Act.

b. The Government asserts the right to off-set any unpaid amounts earned by the defaulted contractor, including retained percentages and progress estimates for work accomplished prior to termination, by any Government claims against the defaulted contractor under the defaulted contract. The Surety reserves any and all of its rights to challenge the propriety of any Government off-sets, including, but not limited to, the amount of the off-set and whether the Surety has a priority in the contract balance greater than the Government off-set.

c. The Surety understands that it is the Government's position that the Surety shall not be entitled to be paid any amount in excess of its total expenditures necessarily made in completing the work and discharging its liabilities under its Performance Bond.

d. The Surety further understands that it is the Government's position that the Surety's "actual costs and expenses of completion" do not include expenses under the Surety's Payment Bond obligation. Notwithstanding, it is the Surety's position that the Surety is entitled to recover against the contract balance all costs incurred pursuant to its bond obligations as a result of the contractor's default, whether such costs are incurred under the Performance or Payment Bond.

3. The Surety agrees to diligently proceed with and to complete the work in accordance with the terms and conditions of the defaulted contract within seventy-seven (77) days from its receipt of a Notice to Proceed. This shall not affect any liability of the defaulted contractor or the Surety for liquidated damages computed from the completion date of the defaulted contract.

4. The Surety agrees to prepare, certify, and submit its request for payment in accordance with the terms of the defaulted contract. The invoices shall be submitted in the name of the Surety. The Government shall review all requests for payment and, upon approval, forward payments to the Surety as the sole payee at P. O. Box 5098, Tampa, FL 33675-5098. The Surety will furnish records, documents, and information reasonably available and necessary to verify claimed completion costs. Vouchers or other evidence of the Surety's disbursements shall be prima facie evidence of the fact and extent of the Surety's costs of completion.

5. The Government shall not be bound to any contractor as a result of this Agreement, and shall look only to the Surety for completion in accordance with the terms of this Agreement.

6. Nothing in this Agreement will be in derogation of any obligation the Surety may have to the United States under its Performance Bond on the defaulted contract for unpaid withholding taxes.

7. Nothing in this Agreement shall be construed as constituting acceptance by the Government of the work performed by the defaulted contractor or as modifying, limiting, or releasing the Surety from its obligations to the United States under its Performance and Payment Bonds on the defaulted contract.

8. Nothing in this Agreement shall be construed as creating, altering, or abridging the rights of the parties, or other person, arising out of the Payment Bond on the defaulted contract or out of any payments under the Payment Bond.

9. It is the Government's position that all payments made to the defaulted contractor were proper, and the Government is therefore released from any liability in connection with such payments. The Surety reserves all of its rights to challenge in any respect whether proper Government payments have been made to the contractor prior to default.

10. The Surety and the Government reserve any and all rights each may have with respect to the assertion or defense of any claims, whether such claims arise under the Surety's principal contract, this Takeover Agreement, the completion contract, or the Surety's Performance and Payment Bonds. In addition to any of the foregoing reservation of rights, the Government also reserves its rights to assess liquidated damages.

11. This Agreement shall bind the parties and their successors, and shall not be modified or amended except by a written document duly executed by the parties or their successors.

IN WITNESS WHEREOF, the parties have executed this Takeover Agreement as of the day and year written above.

Witness

CUMBERLAND CASUALTY AND SURETY COMPANY

By:

Title: Vice Pres

Witness

UNITED STATES OF AMERICA

By:

Title:

ADMINISTRATIVE MATTERS

1. This Takeover Agreement is assigned Procurement Instrument Identification (PII) Number N62467-91-C-0701. All correspondence, including invoices for payment, will refer to the assigned PII number.

2. The work involved is for completion of Defaulted Contract No. N62467-88-C-0646, Reserve Training Center, Naval and Marine Corps Reserve Center, Miami, Florida in accordance with Naval Facilities Engineering Command Specification 06-88-0646 of the defaulted contract.

3. Funds available under defaulted Contract N62467-88-C-0646 in the total amount of $671,044.42 are hereby re-obligated to this Takeover Agreement, chargeable to the following Accounting and Appropriation Data: AA 1751235.2551 032 062467 2A N61927 0228C8548206

4. SUBMIT INVOICES FOR PAYMENT TO: RESIDENT OFFICER IN CHARGE
OF CONSTRUCTION
NAVAL TRAINING CENTER
BUILDING 2114
P.O. DRAWER 19087
HERNDON STATION
ORLANDO, FL 32814

5. PAYMENTS WILL BE MADE BY: DISBURSING OFFICER
NAVAL CONSTRUCTION
BATTALION CENTER
PORT HUENEME, CA 93043

6. PAYMENTS WILL BE MADE TO: CUMBERLAND CASUALTY &
SURETY CO
PO BOX 5098
TAMPA, FL 33675-5098

H

03-1 BCA P 32071, ASBCA No. 42920, 2002 WL 31648240 (A.S.B.C.A.)

ASBCA

APPEAL OF -- AEC CORPORATION, INC.

Under Contract No. N62467-88-C-0646

November 20, 2002

APPEARANCE FOR THE APPELLANT: Vivian Katsantonis, Esq.
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
McLean, VA
APPEARANCES FOR THE GOVERNMENT: Fred A. Phelps, Esq.
Navy Chief Trial Attorney
Ellen M. Evans, Esq.
Trial Attorney
Engineering Field Activity Chesapeake
Washington, DC

OPINION BY ADMINISTRATIVE JUDGE LIPMAN ON THE GOVERNMENT'S MOTION TO DISMISS

Appellant, AEC Corporation, Inc. (AEC), contracted through the Small Business Administration to construct a training center for the Navy. The contract was terminated for default in 1991. On appeal, the Board ruled that the termination was invalid. We found that AEC had not repudiated the contract and that it was entitled to time extensions based on the Government's actions. The Federal Circuit reversed our decision and remanded the matter for further proceedings. Appellant has now requested a schedule for resolution of affirmative claims for Government-caused changes and delays. In response, the Government has moved for dismissal of the appeal arguing that AEC did not file affirmative claims with the contracting officer.[FN1] As discussed more fully below, the Government's motion to dismiss is granted.

FINDINGS OF FACT FOR PURPOSES OF THE MOTION

**AEC Contract Performance and Termination**

1. In May 1989, the Naval Facilities Engineering Command, Southern Division, contracted with the Small Business Administration (SBA) for construction of a Naval and Marine Corps Reserve Training Center in Miami, Florida. *AEC Corporation*, ASBCA No. 42920, 98-2 BCA ¶ 29,952 at 148,187.[FN2] The SBA subcontracted the work to AEC at a firm fixed-price of $4,361,631. *Id.*

2. Work on the project had been started by a previous contractor who was terminated for default. Under its contract, AEC was to complete a two-story building, construct a vehicle maintenance training facility, and make various site improvements, including an underground fire line (fire loop). *Id.* Appellant was to start work on 22 June 1989 and to complete work by 19 October 1990. *Id.* at 148,189. The contract provided for liquidated damages at a rate of $2,200 per day for every day that completion was delayed. *Id.* at 148,187.

3. The contract contained the clause DEFAULT (FIXED-PRICE CONSTRUCTION), FAR 52.249-10 (APR 1984). *AEC Corporation*, 98-2 BCA at 148,187. This clause gave the Government the right to terminate the contract if AEC refused or failed to prosecute the work required under the contract so as to insure its completion within the time specified in the contract or if it failed to actually complete the work in that time. FAR 52.249-10(a). It also provided that appellant and its sureties would be liable to the Government for any damage resulting from the default. *Id.*

4. AEC was required to furnish payment and performance bonds. *AEC Corporation*, 98-2 BCA at 148,189. Because the project exceeded

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 4

appellant's normal bonding capacity, it had some difficulty in obtaining bonds. After the Government issued a cure notice and threatened default, AEC entered into an agreement with Kimmins Contracting Corp. (Kimmins) and Surety Specialists, Inc. (SSI). Kimmins and SSI were to help appellant obtain bonds. Under the agreement, Kimmins was allowed to oversee contract performance, and Kimmins and appellant set up a joint bank account for the deposit of progress payments. AEC also agreed to defend and indemnify Kimmins and SSI from and against all losses, claims, and suits arising out of the bonds or contract performance. *Id.*

5. As a result of the agreement with Kimmins and SSI, Cumberland Casualty & Surety Company (Cumberland) issued performance and payment bonds for the contract work. *Id.* at 148,190. In a separate agreement, AEC agreed that Cumberland had the right to "take possession of any part or all of the work" under appellant's contract with the Government "in the event of any breach, delay or default asserted by the obligee" in the bonds. *Id.* When the Government received the bonds, it withdrew its cure notice and issued Modification No. P00001. *Id.* at 148,191. The modification required that work start by 14 August 1989 and be completed by 12 December 1990. *Id.*

6. The Government was concerned about the pace of appellant's work from the outset. *Id.* at 148,192. AEC experienced problems with its subcontractors and in dealing with Kimmins and Cumberland. *Id.* Over the course of 1990, the Government and appellant corresponded about the schedule for completion of the contract. *Id.* at 148,193-94. The parties met in December 1990. *Id.* at 148,194. Based on the meeting, it was the Government's understanding that contract performance could extend into April 1991. The Resident Officer in Charge of Construction (ROICC) asked AEC to document any requests for time extensions. Appellant responded to the ROICC's request on 19 December 1990. AEC sent him a "preliminary" list of items to which "time extensions appear to be warranted." In reply, the Government noted a lack of documentation for the time extensions requested. The ROICC also warned appellant that because the original contract completion date had passed, liquidated damages could be assessed. *Id.*

7. On 31 December 1990, the ROICC issued an order requiring AEC to show cause why the contract should not be terminated for default. In a letter dated 22 January 1991, appellant stated that it would prepare a revised CPM schedule and present the analysis in a meeting to be held on 23 January 1991. Mr. George Robinson prepared the schedule analysis for AEC and Kimmins.[FN3] Mr. Robinson's analysis was sent to the Government on 22 January 1991.[FN4] In the analysis, he concluded that the Government had caused the contract delay and he forecast completion of the contract on 16 April 1991. AEC requested a time extension to 16 April 1991. *Id.* at 148,194.

8. Mr. Robinson discussed his report at the 23 January 1991 meeting. *Id.* He later testified that the discussion included his opinion that a large part of the time extensions were compensable and that the Government owed AEC between $400,000 and $500,000. He said that about half of that amount was the cost per day for the time period of compensable delay and that the remainder represented direct costs. He said he used an overhead rate of about $1,000 per day "for purposes of discussion." (Tr. 5/371-73) Mr. Kurt Musser, the Resident Engineer in Charge of Construction, testified that Mr. Robinson did not discuss any costs associated with his CPM analysis at the 23 January 1991 meeting and that the only documentation he provided was the CPM schedule and cover letter (tr. 10/140-43). Appellant has not pointed to and we are not aware of any further documentation or support provided by Mr. Robinson. Mr. Musser later testified that he did not remember details of parts of the meeting (tr. 10/178). The Government's contract specialist stated that she did not recall money being discussed at the 23 January 1991 meeting (tr. 7/74). The testimony of AEC's President, Mr. Manuel del Campo, was equivocal on this point (tr. 8/269, 285). The Government asked AEC for documentation in support of the conclusion that the Government had caused the delay. *AEC Corporation*, 98-2 BCA at 148,194.

9. Also at the 23 January 1991 meeting, Cumberland requested that the Government not withhold liquidated damages. *Id.* at 148,195. The ROICC asked for a letter from Cumberland indemnifying AEC. The surety agreed to pay some of appellant's suppliers and subcontractors, and the Government agreed not to assess liquidated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

damages at that time. *Id.* The Government had withheld $33,000 as liquidated damages from its payment of AEC's Invoice No. 14 in December 1990. That withholding was released in the next payment to appellant in February 1991. In that and the following payments to AEC, the Government noted that potential liquidated damages were not being held "pursuant to indemnification by Surety." (Gov't resp., exs. 9, 10, 11)

10. By letter dated 31 January 1991, AEC submitted additional information on the fire loop, storefront, and cold water insulation issues which, it said, contributed to the contract delay. It also stated that it would provide more information. *AEC Corporation*, 98-2 BCA at 148,195. In response, the ROICC requested a date by which AEC would provide additional information and said that his office would not respond to the delay issues until all documentation for all issues was received. *Id.* The record does not contain any indication that appellant provided the ROICC with additional information.

11. We have examined the four documents relied upon by appellant to establish jurisdiction: (1) the 19 December 1990 letter from AEC to the ROICC, (2) the 22 January 1991 letter from AEC to the ROICC, (3) the 22 January 1991 letter from AEC to the ROICC transmitting George Robinson's analysis and Mr. Robinson's analysis, and (4) the 31 January 1991 letter from AEC to the ROICC with enclosures (R4, sec. 1, tabs N, S, T, V). None contain a request for a final contracting officer decision. None specify an amount being claimed as monetary compensation. None specify a daily overhead rate, contain any data regarding an overhead rate, or indicate how an overhead rate would be calculated. And, none include the certification required for certain claims by the Contract Disputes Act (CDA), 41 U.S.C. § 605(c)(1)
.

12. In February 1991, the ROICC told AEC that he had decided not to continue termination for default proceedings but that his office would closely monitor appellant's progress. *AEC Corporation*, 98-2 BCA at 148,195-96. The ROICC believed 26 April 1991 to be a realistic completion date. *Id.* at 148,196.

13. AEC continued to have problems in dealing with Kimmins and SSI/Cumberland. Among other things, appellant asserted that Kimmins was interfering with its performance of the contract. SSI alleged that appellant had breached their agreement and threatened to take over the contract. *Id.*

14. On 20 March 1991, the Government issued a cure notice to AEC. The Government complained about the progress of work and the declining number of man-hours used on the job. It said that its earlier decision not to terminate the contract was based on appellant's assurances that it would complete the contract by the end of April 1991. *Id.*

15. In Modification A00032, the Government extended the contract completion date to 22 January 1991. *Id.*

16. On 3 April 1991, appellant responded to the Government's cure notice. *Id.* at 148,197. Appellant asserted that Government-caused changes and delays made an April 1991 completion impossible. AEC also pointed to its problems with Kimmins and Cumberland. In response, the Government directed appellant to substantiate its " vague" allegations of Government-caused changes and delay by 5 April 1991. The Government also noted that appellant had been ordered to cure its slow work pace. *Id.*

17. AEC responded to the Government's letter on 5 April 1991. Appellant stated that it could not cure the deficiency nor give assurances as to when the project would be completed. *Id.* With regard to its assertion of Government-caused delay, appellant referred the Government to the correspondence sent in anticipation of the 23 January 1991 meeting and said that although some items had been resolved others had not. Appellant specifically mentioned the fire loop issue but said it could not prepare a complete claim package at that time. *Id.* It stated that it reserved its rights and would "formulate a claim position . . . once the full impact of the delay is known." AEC went on to say that it hoped frivolous litigation could be avoided but it needed to reserve its right to pursue a claim "should our negotiations fail." (R4, sec. 2, tab Q)

18. In a separate 5 April 1991 letter to the Government, AEC complained about its inability to obtain funds from its joint bank account with Kimmins and Cumberland. *AEC Corporation*, 98-2

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

BCA at 148,198.

19. The parties met on 9 April 1991. The ROICC stated that, based on "all known modifications," the contract completion date would be 3 March 1991. He went on to discuss a 7 June 1991 actual completion date. *Id.* Regarding the fire loop issue, the ROICC said that the Government was waiting for a detailed cost breakdown from appellant. *Id.* at 148,199. At the end of the meeting, the Government gave appellant an unsigned show cause letter. AEC received a signed copy on 11 April 1991. The letter said that the Government was considering a termination for default and asked for appellant's response. *Id.*

20. Following the meeting, the ROICC asked Cumberland whether it would complete work on the contract following a termination and Cumberland responded in the affirmative. *Id.* The Government sent Cumberland a draft takeover agreement on 11 April 1991. *Id.* at 148,200. The cover letter stated that it was anticipated that a default termination of AEC would be issued around 20 April 1991. *Id.*

21. In Modification No. A00033, dated 17 April 1991, the contract completion date was extended to 3 March 1991. *Id.* at 148,201

22. On 18 April 1991, the ROICC requested that the contracting officer terminate the contract for default. *Id.* The contracting officer issued a termination for default on 22 April 1991 in Modification No. P00037. *Id.* The modification did not assess liquidated damages against AEC (R4, sec. 2, tab S).

23. AEC responded to the show cause letter on 22 April 1991. *AEC Corporation*, 98-2 BCA at 148,201-02. It referred to its 22 January 1991 letter and subsequent correspondence on the claimed causes of delay. *Id.* at 148,202. The fire loop and storefront issues were identified as the primary reasons for delay. It also said that the Government's refusal to consider compensable delays had had a devastating impact on appellant's financial strength. *Id.*

**Completion of the Contract by Cumberland and Its Appeal**

24. On 2 May 1991, the Government and the surety, Cumberland, entered into a takeover agreement for completion of the contract. *Id.* at 148,202.

25. Cumberland completed the contract. *AEC Corporation*, ASBCA No. 42920, 95-2 BCA ¶ 27,750. The Government took beneficial occupancy of the Reserve Training Center on 9 October 1991 (Gov't resp., ¶ 2; ex. 4). Cumberland later submitted a claim seeking additional compensation, a time extension, and remission of liquidated damages. The Government claimed 219 days of liquidated damages at $2,200 per day or $481,000. (Gov't resp., ¶ 3) Based on the beneficial occupancy date of 9 October 1991, the Government claimed liquidated damages back to the 3 March 1991 completion date on AEC's contract. The contracting officer denied Cumberland's claims in October 1993 (Gov't resp., ¶ 3; ex. 5). Cumberland appealed the contracting officer's decision to the Court of Federal Claims in June 1994. Among other things, Cumberland argues that it is entitled to the remission of all liquidated damages. (Gov't resp., ¶ 3; ex. 6) The Court of Federal Claims litigation is on-going (Gov't mot. at 5).

**AEC's Appeal and Remand from the Federal Circuit**

26. AEC filed this appeal of the default termination of its contract on 9 May 1991. *AEC Corporation*, 98-2 BCA ¶ 29,952 at 148,202. The sole issue before the Board was the propriety of the termination for default. *Id.* at 148,187.

27. Cumberland attempted to intervene in this appeal in 1992. We denied the motion. *AEC Corporation*, ASBCA No. 42920, 93-2 BCA ¶ 25,793. We concluded that Cumberland was not asserting a claim against the Government under either the defaulted contract or under the takeover agreement and that the interests of Cumberland and AEC in overturning the default termination were the same. *Id.*

28. At about the same time that this appeal was filed, appellant sued Kimmins, Cumberland, and SSI in state court in Florida. *AEC Corporation*, ASBCA No. 42920, 95-2 BCA ¶ 27,750. The suit was settled in late 1992. *Id.* As part of the settlement, AEC purported to assign its rights in this appeal to Cumberland. *Id.* The Government then filed a motion to dismiss arguing that the attempted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

assignment violated the anti-assignment statutes. *Id.* We denied the motion in 1995 and we ruled that, although the settlement agreement violated 31 U.S.C. § 3727, AEC did not forfeit its appeal rights and it could continue to pursue them here. *Id.*

29. The appeal proceeded as a challenge to the propriety of the termination for default. A hearing was held in 1995 which resulted in the Board's decision on the merits. *AEC Corporation*, 98-2 BCA ¶ 29,952.

30. Our decision addressed six items that appellant claimed required time extensions or had otherwise adversely affected its performance. As to the fire loop, storefront, and electrical work issues, we determined that AEC was entitled to time extensions of the contract completion date to 16 May 1991. *Id.* at 148,202-05, 148,208-09. We found that AEC was not entitled to time extensions for the cold water insulation, roof plywood, or floor patching and ceramic tile issues. *Id.* at 148,204-05, 148,208-09. We further decided that appellant had not repudiated the contract. *Id.* at 148,210. Because the time extensions extended the contract completion date beyond the date of the termination for default and because there was no evidence that AEC could not have completed the contract by the new completion date, we found that the termination for default was improper. *Id.* at 148,211. In December 1998, we denied the Government's request for reconsideration. *AEC Corporation*, ASBCA No. 42920, 99-1 BCA ¶ 30,181.

31. The Government appealed our decision to the United States Court of Appeals for the Federal Circuit. The Federal Circuit ruled that AEC had failed to adequately respond to the Government's requests for assurances of timely performance. *Danzig v. AEC Corporation*, 224 F.3d at 1338-39. Appellant's failure was a breach of the contract, and the termination for default was justified on that ground. *Id.* at 1339-40. The court did not address the time extensions granted in our 1998 decisions.

32. Following the Federal Circuit's decision, AEC sent a letter to the Board requesting that we set a briefing and hearing schedule "related to the quantum that AEC is entitled to recover as a result of the Government-caused changes and delays." Shortly thereafter, the Government moved for dismissal of the appeal. A conference call was held with the parties in August 2002, and appellant was requested to submit a summary account of the claims still being asserted and the Government was requested to respond.

33. In its Summary of Claims dated 10 September 2002, appellant says that it is entitled to $663,843.10 as a result of our 1998 decision in this appeal. This total is composed of the following amounts.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| Fire Loop Delay (159 days) | $218,354.70 |
| Excavation costs for Fire Loop | 20,000.00 |
| Storefront Delay (78 days) | 107,117.40 |
| Electrical Work Delay (30 days) | 41,199.00 |
| Remission of Liquidated Damages (74 days) | 162,800.00 |
| CDA Interest on Liquidated Damages | 114,372.00 |

The three delay claims were calculated using the time extensions granted in our 1998 decision and a daily overhead rate of $1,373.30. Because the time extensions changed the contract completion date to 16 May 1991, appellant asserts that the liquidated damages that have been assessed against Cumberland should be remitted from the original completion date of 3 March 1991 through 16 May 1991 (74 days at $2,200 per day).

34. The Government's motion has been fully briefed and the parties have responded to the request for submissions made in the August 2002 conference call.

DECISION

Appellant has asked the Board to proceed with the adjudication of its affirmative claims for time extensions and costs. Appellant contends that the Federal Circuit's decision did not affect our ruling that AEC should receive time extensions and that we can now rule on how much it is entitled to as a result of the time extensions. The Government has moved for dismissal of the appeal. In essence, it argues that the Board's subject matter jurisdiction was limited to the propriety of the termination for default (which has been decided), that appellant has not submitted any affirmative monetary claims to the contracting officer, and that the contracting officer has not assessed liquidated damages against appellant.

In remanding the *AEC* appeal, the Federal Circuit directed the Board to "address the remaining issues of liability based on our holding that the default termination was valid." *Danzig v. AEC Corporation* , 224 F.3d at 1340. Appellant considers the " remaining issues" to relate to the monetary relief and remission of liquidated damages resulting from the time extensions granted in our 1998 decision. Each of those issues is addressed below.[FN5]

We agree with appellant that the default termination of its contract does not automatically preclude AEC's ability to pursue affirmative claims under the contract. At the same time, such claims must have been presented to the contracting officer in accordance with the CDA, 41 U.S.C. §§ 601-613. That is a jurisdictional prerequisite to the Board's consideration of the claims. *American Consulting Services, Inc.*, ASBCA No. 52923, 00-2 BCA ¶ 31,084. Because the requirement goes to our jurisdiction, it cannot be waived by the Government or excused by the Board. *See, e.g., The Swanson Group, Inc.*, ASBCA No. 53496, 02-1 BCA ¶ 31,800, and appellant has the burden to demonstrate that the requirement was met. *Cedars-Sinai Medical Center v. Watkins*, 11 F.3d 1573, 1583-84 (Fed. Cir. 1993), *cert. denied*, 512 U.S. 1235 (1994) (where the Government makes a factual challenge to jurisdiction, the contractor has the burden to demonstrate facts supporting its jurisdictional contentions.).

The CDA requires a Government contractor seeking redress to submit a written claim to a contracting officer for a final decision. 41 U.S.C. § 605(a). In interpreting the CDA and its implementing regulation on this point, FAR 33.201, the Federal Circuit has identified three requisites for a valid claim: (1) the contractor must submit the demand in writing to the contracting officer; (2) the demand must be made as a matter of right; and, (3) the writing must set out a sum certain. *Essex Electro Engineers, Inc. v. United States*, 960 F.2d 1576, 1580 (Fed. Cir. 1992), *cert. denied*, 506 U.S. 953 (1992); *H.L. Smith v. Dalton*, 49 F.3d 1563, 1565 (Fed. Cir. 1995). No particular form is needed except that the "contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maintenance, Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987); *H.L. Smith*, 49 F.3d at 1565. In addition, in 1991 claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exceeding $50,000 had to be certified in accordance with 41 U.S.C.A. § 605(c)(1) (1987).[FN6]

Appellant lists the fire loop, storefront, and electrical work items as extant claims for monetary relief (finding 33). AEC has identified four documents in which, it says, these items were presented to the contracting officer (app. opp. at 13-14; app. summ. at 3-4, exs. 3-6). The documents are a 19 December 1990 AEC letter to the ROICC (app. summ., ex. 3; R4, sec. 1, tab N), a 22 January 1991 AEC letter to the ROICC (app. summ., ex. 4; R4, sec. 1, tab S), the 22 January 1991 George Robinson CPM analysis sent to the ROICC by AEC on the same day (app. summ., ex. 5; R4, sec. 1, tab T), and notes on the items sent to the ROICC by AEC on 31 January 1991 (app. summ., ex. 6; R4, sec. 1, tab V). (Findings 6, 7, 10, 33) We have examined these documents, and we conclude that they do not constitute claims for affirmative monetary relief within the meaning of the CDA.

The documents did not set out a sum certain or otherwise provide enough information for evaluation by the contracting officer (finding 11). The most that can be said is that the documents approximated the number of delay days that appellant thought was appropriate. Even then, however, the initial numbers were "preliminary," they appeared to change between December 1990 and January 1991, and, in the latest document, appellant said that its research was continuing (findings 6, 7, 10). The Government told AEC that it would not respond to the issues appellant had raised until appellant provided all of the documentation for all of AEC's issues (finding 10). Appellant has not pointed to any additional documentation that it provided to the contracting officer, and we see none in the record. In fact, the Government was continuing to request information in April 1991 (finding 16). In addition, the documents relied upon by AEC do not contain an express or implied request for a contracting officer's final decision (finding 11). *Winding Specialists Co., Inc.*, ASBCA No. 37765, 89-2 BCA ¶ 21,737. This is not inconsistent with the indication in appellant's 5 April 1991 letter that it had not yet formulated a claim position and that it was still in negotiations with the Government (finding 17).

Even assuming that AEC's documents could be read to request a specific number of delay days, such a request would not quantify an affirmative money claim. Not only did appellant not state the total amount it was claiming, it did not specify an overhead rate that could have been used to calculate that number (finding 11).[FN7] The fact that appellant has now quantified the amount sought and provided the calculation of its overhead rate does not cure its failure to submit a proper claim at the appropriate time. *Logus Manufacturing Company*, ASBCA No. 26436, 82-2 BCA ¶ 16,025.[FN8]

There is an additional problem with the fire loop and storefront delay "claims." In 1991, the CDA required the certification of claims that exceeded $50,000. 41 U.S.C.A. § 605(c)(1) (1987). As recently quantified, AEC seeks more than $50,000 for the fire loop and storefront items. However, there is no evidence that it certified those items in the documents identified as its claims (finding 11). Thus, even if those items had been the subject of otherwise valid claims, they would have to be dismissed for lack of certification. *James Reedom, dba J&M Electronic*, ASBCA No. 30226, 85-1 BCA ¶ 17,879; *FKW, Incorporated*, ASBCA No. 42834, 92-1 BCA ¶ 24,651.

The fact that appellant asserted, the parties litigated and the Board granted time extensions is of no benefit to AEC. Requests for time extensions under the Default clause may be asserted without a corresponding request for money. We have allowed the assertion of such requests as "nonmonetary" claims. *Skip Kirchdorfer, Inc.*, ASBCA Nos. 40515 *et al.*, 93-3 BCA ¶ 25,899. We have also allowed their assertion as affirmative defenses where they had not been submitted to the contracting officer as claims. *Oni Construction, Inc.*, ASBCA No. 45394, 93-3 BCA ¶ 26,063; *see also E. Huttenbauer & Son, Inc.*, ASBCA No. 44639, 94-2 BCA ¶ 26,903; *Anchor Fabricators, Inc.*, ASBCA No. 40893, 91-3 BCA ¶ 24,231. It was in the latter context that AEC's requests for time extensions were before us and that we decided them.[FN9] That we did so does not mean that we now have jurisdiction to decide associated monetary claims that were not properly presented to the contracting officer.[FN10]

Appellant's affirmative money claims must be dismissed. The dismissal is without prejudice to the proper submission of such claims to the contracting officer. It would be premature for us to rule on whether our previous ruling on time extensions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would bind the parties under law of the case, collateral estoppel, or some other theory. That issue will undoubtedly arise if AEC submits proper claims from which an appeal is taken.

Appellant also asserts the time extensions granted in our 1998 decision as a defense to a Government claim for liquidated damages. The first problem facing appellant here is that the Government did not assess liquidated damages against AEC under the contract with AEC.

As a general matter, the scope of an appeal is circumscribed by the parameters of the claim, the contracting officer's decision, and the contractor's appeal. The Government did withhold liquidated damages from AEC in December 1990. Based on an agreement with Cumberland, however, the money withheld was released in the next payment and the Government did not make a further attempt to impose liquidated damages against appellant. (Finding 9) The contracting officer's decision was limited to terminating the contract for default (finding 22). AEC's appeal was limited to challenging the propriety of the termination (finding 26). Apparently in reliance on the agreement with the surety, the Government later assessed liquidated damages against Cumberland for a period of time that included appellant's performance under its contract with the Government. Cumberland appealed the entirety of that assessment to the Court of Federal Claims. (Findings 24, 25)

AEC contends that because of the time extensions granted in our decision on the default termination at least some of the previously assessed liquidated damages should be remitted. The record reflects that the modification terminating the contract for default did not assess liquidated damages and there is no other contracting officer decision under this contract assessing liquidated damages against AEC. Under these circumstances, we lack jurisdiction to consider appellant's remission claim. *Sandonato Construction Corp.*, ASBCA No. 40160, 92-1 BCA ¶ 24,754 at 123,512; *C.T. Builders*, ASBCA No. 51615, 99-1 BCA ¶ 30,319; *Peter Bauwens Bauunternehmung GmbH & Co. KG*, ASBCA No. 44679, 98-1 BCA ¶ 29,551, *aff'd*, 194 F.3d 1338 (Fed. Cir. 1999) (table).

The Government did impose liquidated damages on Cumberland in a decision under Cumberland's takeover contract. That decision is on appeal before the Court of Federal Claims. (Finding 25) AEC argues that we should remit the liquidated damages that were assessed against Cumberland for the time period before the termination of appellant's contract and the takeover by Cumberland. However, appellant has provided no authority under which we could rule on the propriety of the assessment of liquidated damages against an entity not before us, under a contract not before us, and the merits of which are being litigated in another forum. We know of no such authority. The most that we can do is what we have already done - grant the time extensions to which AEC was entitled. The impact of those time extensions on a different contractor and under a different contract must be decided by the tribunal in which that contractor filed its appeal. *Cf. DWS, Inc.*, ASBCA No. 33245, 87-3 BCA ¶ 20,133 (*on reconsid.*); *see also DWS, Inc. v. United States*, 18 Cl. Ct. 453 (1989).

CONCLUSION

Because appellant did not submit an affirmative money claim to the contracting officer, no such claim is before the Board. Because the Government did not assess liquidated damages against appellant, we have no reason or basis to rule on the remission of liquidated damages. Accordingly, there is nothing further for the Board to address, and this appeal is dismissed.

RONALD JAY LIPMAN
Administrative Judge
Armed Services Board of Contract Appeals
I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board of Contract Appeals
I concur

EUNICE W. THOMAS
Administrative Judge
Vice Chairman
Armed Services Board of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 42920, Appeal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of AEC Corporation, Inc., rendered in conformance with the Board's Charter.

EDWARD S. ADAMKEWICZ

Recorder

Armed Services Board of Contract Appeals

FN1. The Government also requests that its motion be referred to the Board's Senior Deciding Group. The Chairman has determined that the issues raised by the motion are not of such unusual difficulty, significant precedential importance, or dispute within the normal decision process as to justify referral to the Senior Deciding Group. Accordingly, he has denied the Government's request.

FN2. That *AEC* decision was affirmed on reconsideration in *AEC Corporation*, 99-1 BCA ¶ 30,181, and reversed on a narrow legal ground in *Danzig v. AEC Corporation*, 224 F.3d 1333 (Fed. Cir. 2000), *cert. denied sub nom., AEC Corporation v. Pirie*, 532 U.S. 995 (2001). The Federal Circuit's decision did not disturb our factual findings in 98-2 BCA ¶ 29,952.

FN3. Mr. Robinson is a scheduling consultant (tr. 5/316-320). His firm was hired by Kimmins to prepare the CPM analysis (tr. 6/629-333).

FN4. This document refers to exhibits A through G. The exhibits are not included with the copy of Mr. Robinson's letter in either the Rule 4 file or the attachments to appellant's summary of claims. Some of the exhibits appear to be in hearing exhibit G-9. AEC does not appear to argue that exhibits A through G were a part of its claim.

FN5. In the 1998 decision, we granted time extensions on the fire loop, storefront, and electrical work items. We denied time extensions on the cold water insulation, roof plywood, and floor patching / ceramic tile matters. (Finding 30)

FN6. Congress changed the threshold amount for certification to $100,000 in 1994. 41 U.S.C.A. § 605(c)(1) (West Supp. 2002).

FN7. There is a dispute in the testimony as to whether George Robinson's presentation at the 23 January 1991 meeting included his view of the amount of compensation due appellant (finding 8). Even if we were to find that he did discuss compensation, we could still not find that appellant submitted a money claim. Mr. Robinson's presentation on this issue was oral and, as such, would not satisfy the requirement that a claim be written. *Cf. International Business Investments, Inc.* , ASBCA No. 31076, 85-3 BCA ¶ 18,407 (oral request for a contracting officer decision at a meeting between the parties did not meet the CDA). In addition, Mr. Robinson's statements that appellant was owed between $400,000 and $500,000 and that its overhead rate was "about" $1,000 per day (finding 8) cannot be considered a request for a sum certain. *See Corbett Technology Company, Inc.*, ASBCA No. 47742, 95-1 BCA ¶ 27,587. This is especially true where, as here, Mr. Robinson did not submit any documentation or support for his figures (finding 8).

FN8. Although we focus on the purported delay claims, the documents relied upon by AEC also fail, in our view to state an affirmative claim for the fire loop excavation costs. They have the same shortcomings as do the delay items.

FN9. As noted above, we do not dispute appellant's contention that it may assert affirmative claims despite the termination of its contract. We are simply saying that such claims must comply with the CDA. We do not read the decisions cited by appellant (app. opp. at 6-7) to be inconsistent with that proposition.

FN10. The issue is not, as AEC suggests (app. opp. at 9-10), whether the contracting officer issued a final decision on the affirmative claims but whether the claims were presented to him in the manner required by the CDA.

03-1 BCA P 32071, ASBCA No. 42920, 2002 WL 31648240 (A.S.B.C.A.)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CUMBERLAND
CASUALTY & SURETY COMPANY

4311 West Waters
Suite 501
Tampa, FL 33614
813/885-2112
FAX: 813/885-6734

September 3, 1992

Commander
Naval Facilities Engineering Command
c/o R.O.I.C.C. NAVFAC Southern Division
P.O. Drawer 149087
Orlando, Florida 32814-9087

Attention: Commander
Naval Facilities Engineering Command

Reference: Naval Reserve Training Center
Contract No. N62467-91-C-0701
USN & MCRTC, Miami, Florida

Subject: Request for Contracting Officer's
Final Decision

Gentlemen:

Cumberland Casualty & surety hereby submits to the Contracting Officer our claims in the amount of $1,046,884.08 as reflected in the attached summary for your final decision.

Claim #1 (Exhibit A) dated December 31, 1991 represents additional work which was completed per the written direction of the Contracting Officer. Claim #2 (Exhibit B) dated February 4, 1992 represents our damages for delays which are the direct result of delays caused by the Government. Claim #3 (Exhibit C) dated March 5, 1992 represents the costs incurred by Cumberland which resulted from the Government's abuse of its discretion concerning progress payments to the AEC Corporation. Claim #4 includes the entire contract balance of $419,068.42 which the Navy is improperly withholding as liquidated damages.

We hereby request issuance of Cumberland Casualty's change order in the amount of $1,046,884.08 for costs associated with Claims #1, #2, #3 and #4. On behalf of Cumberland



EXHIBIT
5

Commander
September 3, 1992
Page Two

Casualty and in full compliance with the Contract Disputes Act of 1978, I hereby certify that the subject claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; and that the amount requested accurately reflects the contract adjustment for which Cumberland Casualty believes the Government is liable.

Very truly yours,

Joseph M. Williams

JMW/sdh

Enclosures

CUMBERLAND
CASUALTY
CUMBERLAND CASUALTY & SURETY COMPANY

0 3 1992

December 31, 1991

Department of the Navy
R.O.I.C.C. NAVFAC Southern Division
P.O. Drawer 149087
Orlando, Florida 32814-9087

Attention: Commander Glenn A. Cutler
United States Navy

Reference: Naval Reserve Training Center
Contract No. N62467-91-C-0701
USN & MCRTC, Miami, Florida

Subject: Pending Claims

Gentlemen:

Attached please find a summary of claims for equitable adjustment and compensable extensions of time which Cumberland Casualty & Surety intends to submit to the Department of the Navy for the completion of the above referenced project. Per your request, a brief synopsis is included for each specific claim. Back-up is available for all claim items and will be submitted upon your request.

As we have previously discussed, Cumberland Casualty and its representatives would appreciate being afforded the opportunity to meet with you and your staff prior to the submission of a formal claim package to discuss each claim item to determine if a mutually acceptable resolution may be achieved prior to submitting a claim package and seeking a final decision.

Please contact Mr. John Zemina to arrange a meeting. We look forward to discussing these issues with you.

Very truly yours,

Joseph M. Williams



Administrative Offices • 1501 2nd Avenue • Tampa, Florida 33605

1. Pursuant to the disbursement agreements, the Government and the AEC Corporation deposited $106,000 into an unauthorized account. Subsequently, the funds were not utilized to pay suppliers and/or subcontractors. The Navy knowingly abused its discretion as to the remaining contract balance.
$106,000.00

2. Overpayments to the AEC Corporation for work which was either not performed or performed incorrectly prior to the default termination of the AEC Corporation. The Navy knowingly abused its discretion as to the remaining contract balance as a result of the gross overpayments. Back-up for these figures is available.

| | | |
|---|---|---|
| A. | Electric | $ 59,696.00 |
| B. | Sitework | 119,797.00 |
| C. | Aluminum Railings | 14,905.00 |
| D. | Epoxy grout interior stair nosings | 5,780.83 |
| E. | Painting | 10,317.00 |
| F. | Pest Control | 7,371.00 |
| Total | | $217,866.83 |

3. Claims by Cumberland against the Department of the Navy after the execution of the takeover agreement.

A. The existing recessed floor slab completed originally by the Harvester's Group was not completed per the plans and specifications. Additional costs and time was incurred as a result of the required remedial work.
$ 3,151.00

B. The gas lines at the superheater are being insulated under protest. The specifications require all suction lines to be insulated, the gas line at the superheater is not a suction line.
$ 939.26

C. AEC Corporation alleges that plans were ambiguous which caused them to exclude the concrete ad mixture in the concrete prior to the pouring of the assembly hall floor.
$ 9,056.00

D. The Government instituted a change in hot water heaters from gas fired to electric powered. Our subcontractors incurred additional costs and a compensable time delay.
$ 3,155.92

E. The Government directed Cumberland to remove the existing concrete stairs which were cracked. The Government agreed to pay for the replacement of the stairs if the

stairs on the west side of the building cracked. After the stairs cracked the Government refused to pay for the replacement of the stairs. The Government then directed the Contractor to reinstall the stairs without using the required expansion joint. Cumberland Casualty asserts that the stairs cracked because of the expansion coefficients of the different materials. (Cast aluminum nosings versus concrete)

$ 10,618.00

F. The motor shown for exhaust fan #15 was not compatible with the electrical wiring diagram shown on the electrical drawings. The motor was replaced at the direction of the U.S. Navy.

$ 1,026.00

G. The Government directed the Contractor to install condensate lines at the fan coil units even though none are shown on the drawings and none are discussed in the specifications. The drawings clearly show condensate lines in other locations yet none are shown at the fan coil units.

$ 5,738.00

H. The Government was provided with a copy of the factory keying schedule for the lock cylinders. The keying schedule referenced in the specifications cannot be accomplished. The Government did not voice any objections to the factory keying schedule until after the cylinders were installed. Additional costs were incurred.

$ 3,382.00

I. The Government provided three (3) modifications to the contract for repairs to the fire line loop. After completion of the repairs the Government decided the costs were excessive and unilaterally chose not to pay the amount due and owing. In addition, sidewalks, asphalt and other areas had to be replaced as a result of the repairs. The Contractor incurred additional costs and a compensable time delay.

$ 15,525.00

J. The areas shown to have seed installed had an excessively steep grade which caused numerous washouts in the seeded areas during rainfall. The subcontractor has made several attempts, including adding sod, to remedy the problem but has been unsuccessful.

$ 2,432.00

K. The drawings indicated that recessed fire extinguisher cabinets were to be utilized. The actual field conditions precluded the use of the specified recessed

cabinets. The Contractor was unable to return the recessed cabinets and was forced to purchase new cabinets for additional monies.

$ 1,187.00

L. Directed to replace diaelectric unions at chillers after the specified diaelectric unions failed. The specific diaelectric couplings contained a neoprene gasket which was not able to handle the high temperatures involved in the gas line.

$ 945.00

M. Directed to install two fire dampers not shown on drawings.

$ 939.00

N. Provided and installed insulation reported missing at start of project. The Government provided a material list which identified specific materials which were stored on site. The Government was notified of the material deficiency as soon as it was identified.

$ 3,116.00

CUMBERLAND
CASUALTY & SURETY COMPANY

4311 West Waters
Suite 501
Tampa, FL 33614
813/885-2112
FAX: 813/885-6734

February 4, 1992

Department of the Navy
R.O.I.C.C. NAVFAC Southern Division
P.O. Drawer 149087
Orlando, Florida 32814-9087

Attention: Commander Glenn A. Cutler
United States Navy

Reference: Naval Reserve Training Center
Contract No. N62467-91-C-0701
USN & MCRTC, Miami, Florida

Subject: Damages for Delay

Pursuant to the project schedule updates previously submitted to your office (Attached), please find enclosed a submittal of the delay damages incurred by Cumberland Casualty as a result of Government caused delays in the completion of the Project. Cumberland Casualty's claim for delay damages and a compensable time extension is clearly supported in our schedule updates and accompanying narratives.

Cumberland Casualty demands that reimbursement be made for the inexcusable delays caused by the Government. Obviously, any delay claims asserted by the AEC Corporation to the Government are not included in our request for compensation.

We look forward to your expedient review.

Very truly yours,

Joseph M. Williams

Navel Reserve Center
Contractor Delay Costs

Direct Jobsite Overhead Costs:

| | | |
|---|---|---|
| Security Services | | $22,566.51 |
| Toilet Facilities | | 922.20 |
| Field Office Supplies | | 2,555.44 |
| Telephone | | 3,157.15 |
| Water Utilities | | 2,162.29 |
| Electric Utilities | | 24,785.71 |
| Automobile/Truck Expenses | | 3,131.28 |
| Miscellaneous Equipment | | 2,380.79 |
| Dumpster Service | | 6,370.00 |
| Travel | | 9,064.30 |
| Project Manager | | 22,013.20 |
| Superintendent | | 32,191.18 |
| Secretarial Services (Kelly Temp) | | 6,228.00 |
| Quality Control | | 27,317.60 |
| General Labor | | 9,729.58 |
| Sub-total Direct Cost: | | $174,775.23 |
| Unabsorbed Indirect Costs: | | |
| Contractor Overhead | (10%) | 17,477.52 |
| | | $192,252.75 |
| Contractor Profit | (10%) | 19,225.28 |
| | | $211,478.03 |
| Corporate Management Fee | (3%) | 6,344.34 |
| | | $217,822.37 |
| General Liability Insurance | | 1,895.05 |
| | | $219,717.42 |
| Interest Costs | | 4,943.64 |
| Total Contractor Delay Costs | | $224,661 |

CUMBERLAND
CASUALTY & SURETY COMPANY

MAR 13 1992
ROICC/ORLANDO

4311 West Waters
Suite 501
Tampa, FL 33614
813/885-2112
FAX: 813/885-6734

March 5, 1992

Department of the Navy
R.O.I.C.C. NAVFAC Southern Division
P.O. Drawer 149087
Orlando, Florida 32814-9087

Attention: Commander Glenn A. Cutler
United States Navy

Reference: Naval Reserve Training Center
Contract No. N62467-91-C-0701
USN & MCRTC, Miami, Florida

Subject: Overpayments to Subcontractors

Gentlemen:

As requested during our February 6, 1992 meeting, please find enclosed our revised claim for overpayments made to the AEC Corporation for work which was not completed. Cumberland Casualty asserts that the Government knowingly abused its discretion concerning progress payments to the AEC Corporation. The actual costs incurred by Cumberland for payments made to the Kimmins Contracting Corp. as a result of the overpayments by the Government to the AEC Corporation including costs paid to Kimmins for overhead and profit are $235,944.48.

Very truly yours,

Joseph M. Williams

Joseph M. Williams

ITEM #

29 **Final Grade Site**

| | |
|---|---|
| Schedule of Values | 37,800.00 |
| Paid by Navy | 30,240.00 - 80% |

Work was only 15% complete when AEC was terminated and only 5,670.00 should have been paid to AEC. Overpayment was 24,570.00. Grading was not completed in accordance with the Contract plans and specifications.

41 **Concrete Curbs**

| | |
|---|---|
| Schedule of Values | 3,531.00 |
| Paid by Navy | 177.00 - 5% |

No curbs were installed until after default termination of AEC. Overpayment was 177.00

42 **Pave 2" Asphalt/8" LR Base**

| | |
|---|---|
| Schedule of Values | 68,516.00 |
| Paid by Navy | 61,664.00 - 90% |

The work was only 35% complete upon the default termination of AEC. The work was not performed in accordance with the thickness or limits shown on the plans. Overpayment was $37,683.40. 75% of the area had to be overlaid with new asphalt.

43 **Pave 1 1/2"/6" LR Base**

| | |
|---|---|
| Schedule of Values | 64,277 |
| Paid by Navy | 63,635 - 99% |

The work was only 30% complete upon the default termination of AEC. The parking lot was not completed in compliance with the limits and thickness shown on the plans and had to be extended in areas and cut back in other areas. Overpayment was $44,351.90.

44 **Pave 2" Asphalt/8" LR/Seal**

| | |
|---|---|
| Schedule of Values | 42,178.00 |
| Paid by Navy | 40,069.00 - 95% |

The work was only 75% complete. The seal coating had not been started and the

asphalt was not installed in accordance with the limits shown on plans. Overpayment was 8,435.50.

45 **Concrete Sidewalks**

| | |
|---|---|
| Schedule of Values | 16,801.00 |
| Paid by Navy | 16,801.00 - 100% |

Sidewalks were not 100% complete. Actual completion was 80% upon default termination of AEC. Overpayment was $3,360.20

46 **Concrete Pad at Grease Rack**

| | |
|---|---|
| Schedule of Values | 6,298.00 |
| Paid by Navy | 5,984.00 - 95% |

The concrete pad for the grease rack was not installed at the proper elevation and the concrete approaches were not properly elevated for the usage of the metal grease rack. While the concrete was 95% complete, approximately 25% of the grease rack concrete work had to be redone. Overpayment was $1,888.00

The evaluation of the electrical percentages paid for by the Navy is based upon the following information. Requisition #17 dated February 28, 1991 constitutes the last payment made to the AEC Corporation prior to the default termination by the Navy. The original electrician, Mesa Brothers, continued to work on the project until early April 1991. On July 10, 1991, another electrician, Edd Helms Electric, started work on site and completed the balance of the electrical work.

**Item 335** **Electrical Trim 1st Floor South Wing**

| | |
|---|---|
| Schedule of Values | 28,779.00 |
| Paid by Navy | 27,340.00 - 95% |

The electrical trim out was only 65% complete on the 1st floor south wing. The overpayment was $8,633.65.

**Item 336** **Trim Electric 2nd Floor South Wing**

| | |
|---|---|
| Schedule of Values | 26,601.00 |
| Paid by Navy | 26,068.00 - 98% |

The second floor electrical trim out was only 60% complete prior to the default termination of AEC. The overpayment was $10,107.40.

**Item 337 Trim Electric North Wing**

| | |
|---|---|
| Schedule of Values | 24,680.00 |
| Paid by navy | 24,187.00 - 98% |

The north wing electrical work was only 75% complete. The overpayment was $5,677.00.

**Item 338 Trim Electric VMTF**

| | |
|---|---|
| Schedule of Values | 11,436.00 |
| Paid by Navy | 11,208.00 - 98% |

The VMTF electrical trim out work was only 80% complete. The overpayment was $2,059.20.

**Item 109 Aluminum Railings**

| | |
|---|---|
| Schedule of Values | 28,959.00 |
| Paid by Navy | 11,584.00 - 40% |

The aluminum rail material was inspected and paid for by the Government. The railings were then installed in a method which was not in accordance with the plans and specifications. Accordingly, the installed railing material was rejected. The overpayment was $11,584.00 as none of the rail material was acceptable.

**Item 91 Repair Stair Nosings**

| | |
|---|---|
| Schedule of Values | 1,786.00 |
| Paid by Navy | 1,696.00 - 95% |

Cumberland Casualty is not aware of any repair work which was done on the stair nosings prior to the default termination of the AEC Corporation therefore we assert that 0% of the work was completed and that the overpayment was $1,696.00.

**Item 197 Interior Painting South Wing 1st Floor**

| | |
|---|---|
| Schedule of Values | 30,591.00 |
| Paid by Navy | 24,472.00 - 80% |

The interior painting was only 50% complete. There was extensive painting to be completed on the interior surfaces, including a tremendous amount of punch out work. The overpayment was $9,176.50.

**Item 198** **Interior Painting South Wing 2nd Floor**

| | |
|---|---|
| Schedule of Values | 30,173.00 |
| Paid by Navy | 24,139.00 - 80% |

The interior painting was only 50% complete. Entire rooms had to be repainted and touched up. In addition, at some areas the paint color was incorrect. The classroom doors had also not been sealed. The overpayment was $9,052.50.

**Item 199** **Interior Painting North Wing**

| | |
|---|---|
| Schedule of Values | 11,579.00 |
| Paid by Navy | 10,189.00 - 88% |

The interior painting in the north wing was only 65% complete upon the default termination of the AEC Corporation. The interior wall painting was only 65% complete and extensive punch out work remained to be completed. The overpayment was $2,662.65.

**Item 70** **Special Concrete Entrance**

| | |
|---|---|
| Schedule of Values | 13,370.00 |
| Paid by Navy | 13,236.00 - 99% |

The exterior concrete stairs were installed by the AEC Corporation. The Navy asserted that the AEC Corporation did not install the stairs on the south and east side of the building as required by the Contract specifications. The Navy paid for 99% of the exterior stairs even though 2 sets of the stairs of the stairs had been previously rejected by Navy representatives. The percentage complete was only 20% and the overpayment was $10,562.00.

**Item 360** **Change Order #19**

| | |
|---|---|
| Schedule of Values | 24,715.00 |
| Paid by Navy | 7,415.00 - 30% |

The Navy paid for 30% of the work associated with the change order even though only 10% was complete. The subgrade had not been completed properly, light poles had not been relocated and the new fencing was not started. The overpayment was $4,943.50.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| AEC Corporation | ) | ASBCA No. 42920 |
| | ) | |
| Under Contract No. N62467-88-C-0646 | ) | |

APPEARANCES FOR THE APPELLANT: Barbara G. Werther, Esq.
Vivian Katsantonis, Esq.
Watt, Tieder & Hoffar
McLean, VA

APPEARANCES FOR THE GOVERNMENT: Arthur H. Hildebrandt, Esq.
Navy Chief Trial Attorney
Ellen M. Evans, Esq.
Trial Attorney
Chesapeake Division
Naval Facilities Engineering Command
Washington, DC

OPINION BY ADMINISTRATIVE JUDGE LIPMAN

This is an appeal from the contracting officer's decision terminating the captioned construction contract for default. The record consists of documentary evidence as well as the transcript of testimony of 12 days of hearing.

The sole issue before the Board is the propriety of the termination for default. The Navy terminated the contract due to appellant's alleged "failure to make progress in the work and for default in performance." In this appeal, the Navy has advanced several other alleged grounds justifying the default termination, and it maintains that appellant's performance problems were primarily caused by the actions and omissions of its surety. Our findings, therefore, explore the contractor-surety relationship in some depth. Appellant alleges that it incurred performance delay due to defective contract documents and Navy actions or omissions relating to specific work items under the contract. We address those specific work items in the latter part of our findings.



EXHIBIT
6

FINDINGS OF FACT

On 12 May 1989, the Small Business Administration (SBA), pursuant to the provisions of Section 8(a) of the Small Business Act, entered into a negotiated contract with the Navy's Naval Facilities Engineering Command, Southern Division (SOUTHDIV) for the construction of a Naval and Marine Corps Reserve Training Center in Miami, Florida (Stips. 1, 15). The SBA subcontracted performance of the work to appellant (or AEC) at a firm fixed price of $4,361,631 (Stip. 2).

The contract contained the standard construction contract clauses including FAR 52.249-10 "Default (Fixed-Price Construction) (APR 1984)." It also provided for the imposition of liquidated damages of $2,200 per day of delay beyond the required completion date (Stip. 3). The original contract called for appellant to begin work on 22 June 1989 and to complete the work on or before 19 October 1990 (R4, sec. 1, tab B).

The contract was for the completion of a partially constructed two-story building of approximately 55,000 square feet, a Vehicle Maintenance Training Facility of about 5,800 square feet, and various site improvements including an underground fire line (fire loop) around the perimeter of the main building. (R4, sec 1, tabs B, C)

The Government had previously contracted for the project with Harvesters Group (Harvesters), another small business, and it had terminated that contract for default on 2 July 1987 (ex. A-231 at 8). Following that termination, due to the unavailability of funds, the building remained uncompleted until this contract. It was in a state of disrepair and deterioration, with evidence of animal droppings, vandalism, steel corrosion, and a heavy growth of brush (tr. 3/248).

The contract documents, which appellant received prior to negotiations, included an extensive Technical Supplement (TS), including a statement entitled "Project History - General Work Scope" which emphasized that there were many unknown conditions at the site. There were also included numerous photographs of the site and a detailed set of revised drawings, cross-referenced to the TS. (Exs. G-16, -17; tr. 8/174)

The "Project History - General Work Scope" included the following:

> Whenever testing is required by this Technical Supplement to confirm adequacy or acceptability of existing work and where no Unit prices are called for in new specification Section 01151 - Unit Prices contained in this Technical Supplement for extra work resulting from these tests, costs of this additional work, if any, will be negotiated with the

> Contracting Officer at such time as the full extent of the additional work, if any, is known. Costs for all testing required by the contract documents is to be included in the Contractor's Lump Sum price. (Emphasis in original)

The TS, at §01151, entitled "Unit Prices, Part I-General," included the following:

> . . . due to the current status of construction . . . the Government recognizes that certain items of work completed under the previous contract for construction are not verifiable until such time as certain specified testing is accomplished or until as yet incomplete work items are completed. In view of this, the Government is requesting that certain Unit Prices be submitted by the Contractor with his proposal for those work elements which are now identifiable as possible additional items of work under this contract. These Unit Prices will be reviewed and approved as appropriate by the Contracting officer should it become necessary to include the work covered by these Unit Prices.

(Ex. G-16)

The contract provided for a contractor's quality control system (CQC), which consisted of the quality inspection and control system established and carried out by the contractor to insure compliance with the contract drawings and specifications. It provided that the contractor conduct its own inspections, keep a written record of the results, obtain necessary approvals prior to custom fabrication and before delivery of materials and equipment to the project site, and stated that no actions of the Government's construction representative would relieve appellant of its responsibility under the clause. (Ex. G-16 at §01400-2, ¶¶ 2.1, 2.3, 4.1 and 4.2).

The contract, at §01011, ¶16, called for appellant to submit to the contracting officer for approval a progress chart, constituting a construction schedule and an equipment delivery schedule, with a requirement that the schedules be updated with each invoice for progress payment (ex. G-16). The contract also included the FAR 52.236-15, "Schedules for Construction Contracts (APR 1984)" clause, which also provided for contractor schedules for the purpose of progress payments, and stated, in part:

> (b) . . . If, in the opinion of the Contracting Officer, the Contractor falls behind the approved schedule, the Contractor shall take steps necessary to improve its progress, including

> those that may be required by the Contracting officer, without additional cost to the Government. In this circumstance, the Contracting officer may require the Contractor to increase the number of shifts, overtime operations, days of work, and/or the amount of construction plant, and to submit for approval any supplementary schedule or schedules in chart form as the Contracting Officer deems necessary to demonstrate how the approved rate of progress will be regained.
>
> (c) Failure of the Contractor to comply with the requirements of the Contracting Officer under this clause shall be grounds for a determination by the Contracting officer that the Contractor is not prosecuting the work with sufficient diligence to ensure completion within the time specified in the contract. Upon making this determination, the Contracting Officer may terminate the Contractor's right to proceed with the work, or any separable part of it, in accordance with the default terms in this contract.

(Ex. G-16)

The contract included the FAR 52.222-6, "Davis Bacon Act (FEB 1988)" and FAR 52.222-13, "Compliance with Davis-Bacon and Related Act Regulations (FEB 1988)" clauses. It also incorporated the FAR 52.222-12, "Contract Termination - Debarment (FEB 1988)" clause, as follows:

> A breach of the contract clauses entitled *Davis Bacon Act, Contract Work Hours and Safety Standards Act--Overtime Compensation, Apprentices and Trainees, Payrolls and Basic Records, Compliance With Copeland Act Requirements, Subcontracts (Labor Standards), Compliance with Davis-Bacon and Related Act Regulations, or Certification of Eligibility* may be grounds for termination of the contract, and for debarment as a Contractor and a subcontractor as provided in 29 CFR 5.12.

(Ex. G-16)

Appellant is owned by Mr. Ernest Copeland and Mr. Manual del Campo. Mr. Copeland, appellant's Vice President and Treasurer, was the "lead' estimator for this

project, although Mr. del Campo, appellant's President, took part in the preparation and negotiation of appellant's cost proposal. (Tr. 5/10, 8/175, 177-78)

Prior to commencing negotiations, Mr. Copeland and Mr. del Campo, although having previously visited the site, were taken on a formal walk-through of the site for three to four hours, during which the architect and engineer pointed out items to them (tr. 8/176-78). At the time of the initial walk-through, the floors were generally visible, but there was some ponding of water (tr. 7/188-90).

Negotiations for award of the contract took place in the spring of 1989. Representatives of the Navy's Resident Officer In Charge of Construction (ROICC), including Lt. Patrick Gibbons, took part in the negotiations, and Ms. Brenda Shepard, a contract specialist at SOUTHDIV took the lead in the negotiations and participated by telephone (tr. 2/13, 5/11, 240).

Appellant's initial proposal to perform the contract totaled $4,547,248. Prior to negotiations, it increased its proposal to as high as $4,715,650 as a result of actual quotes it received in lieu of estimates. (Ex. A-313)

By letter of 10 April 1989, appellant submitted to SOUTHDIV's Ms. Shepard a list of its "qualifications and clarifications" for its proposal, which, it stated, was "contingent" on the items being accepted by the Government, but which, it also stated, it looked forward to discussing during negotiations. The Government did accept some of the qualifications, but there were some that it did not accept. (Tr. 10/110-11; ex. A-5)

On 12 April 1989, AEC submitted its revised proposal of $4,361,631 to reflect the negotiated price. The contract was awarded on 12 May 1989 and, as a result, the start of performance was to be 22 June 1989 with completion by 19 October 1990. (Exs. A-6, G-16)

The Navy assigned Lt. Gibbons as the project manager (PM), and he served in that capacity until July 1990. Commander Patrick Cahill was appointed as the ROICC, and he remained in that position until October 1990, at which point he was replaced in that position by Commander Glenn Cutler. The Navy's construction representative, or inspector, on the project was Mr. Mark Farrah. Mr. Kurt Musser was the Resident Engineer in Charge of Construction for the Orlando ROICC office and he was Lt. Gibbons' supervisor. (Stip. 18; tr. 1/38, 2/6, 7, 13, 15, 3/181, 314, 7/186)

Pursuant to the Miller Act, appellant was required to furnish payment and performance bonds for the project. The contract permitted appellant 40 days to do so prior to the commencement of performance. Since this project exceeded AEC's normal

bonding capacity, it attempted to obtain a bond from various sources, including possible joint ventures. It had a difficult time in arranging bonding. (Tr. 8/193)

The parties held a pre-construction conference on 20 June 1989, and AEC stated that it would have bonding in place by 26 June 1989. Following telephone communication between the parties, on 28 June 1989, CDR Cahill, the Navy ROICC, issued a cure notice to the effect that if appellant failed to secure bonding within 10 days the Government would consider terminating the contract for default. Appellant responded and described its efforts to obtain bonding and, by letter of 5 July 1989, indicated other things it was doing to prepare for performance and assured that it would complete performance by 19 October 1990. (Exs. A-11, -12) By letter of 11 August 1989, the Government again threatened default action (ex. A-14).

On 16 August 1989, appellant entered into an agreement (Agreement) with Kimmins Contracting Corp. (Kimmins) and Surety Specialists, Inc. (SSI), agents for Cumberland Casualty & Surety Company (Cumberland), in which SSI and Kimmins agreed to assist AEC in obtaining the required bonds in exchange for a bond premium of 7-1/2 percent of the contract price. AEC also agreed to permit Kimmins to oversee contract performance and to establish, together with Kimmins, a joint bank account, with a $200,000 "contingency," into which all progress payments would be deposited and released upon joint signature of both AEC and Kimmins for payment of direct job costs. AEC agreed to submit to the Government an irrevocable notice and directive that the Government make all payments under the contract directly into the joint bank account. The Agreement also provided that AEC, its principals and their spouses agreed to defend and indemnify Kimmins and SSI from and against all losses, claims and suits arising out of the bonds or contract performance. The Agreement also included the following:

> 3. In compliance with the requirement of NAVFAC, AEC will employ a qualified individual acceptable to Kimmins as project Manager/Quality Control of the project to oversee and be responsible for the on-site performance of the project. AEC agrees to submit to Kimmins reasonably in advance of the commencement of work, a detailed statement containing the qualifications of the person AEC intends to employ as PM/CQ [sic]. AEC further agrees that it will not terminate or reassign the PM/QC without sending timely written notice of such action to Kimmins Contracting Corp.

* * *

> 6. AEC shall at all times have the right and obligation to manage and direct the performance of the contract. Provided, however that if at any time during the progress of the work NAVFAC determines that AEC is not performing the work in a proper and prudent manner, or is failing in any manner to comply with any applicable provisions of the Contract, or is in any manner taking or failing to take actions which will cause claims or demands to be made against the Performance and payment Bond applicable to the Project, Kimmins and or [SSI] shall give AEC written notice indicating therein such improper, imprudent, or deficient performance, action or inaction. AEC shall have a period of five (5) days within which to undertake correction of same or to agree on acceptable corrective action. If AEC fails to take corrective action then Kimmins or [SSI] or the bonding company shall have the right to intervene and take whatever action is necessary to protect their interests under or related to the bond.
>
> * * *
>
> 15. AEC and Kimmins agree that this Agreement shall be subject to the formal approval of the Small Business Administration and NAVFAC and shall become effective only upon such approval.

(R4, sec. 1, tab D)

On the same date as the Agreement, Cumberland issued performance and payment bonds for the contract work (exs. A-18, -19). AEC and Cumberland also entered into a General Agreement of Indemnity (GAI) dated 15 August 1989. Among other things, the GAI provided the following:

> 11. In the event of any breach, delay or default asserted by the obligee in any said Bonds . . . the Surety shall have the right at its option and in its sole discretion and is hereby authorized with or without exercising any other right or option conferred upon it by law or the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts covered by any Bonds . . . .

(Ex. A-15)

Mr. Joseph M. Williams signed the Agreement as Vice President of SSI (R4, sec. 1, tab D). On the same date as the Agreement, he signed the Power of Attorney accompanying the bonds as Cumberland's Senior Vice President, and he signed the reinsurance agreement attached to the bonds as Cumberland's Vice President. As of the end of May 1991, all of Cumberland's shares were owned by Kimmins Environmental Services Corporation, of which 70 percent was owned by Mr. Francis Williams, and administration of the company's affairs was performed by Mr. Francis Williams and Mr. Joseph M. Willams (ex. G-25). As of 1995, Mr. Joseph Williams was the President of Cumberland and was still an officer of SSI (tr. 4/429, 431). As of the date of the Agreement, Cumberland, Kimmins and SSI all shared the same address. (R4, sec. 1, tab B) At all times pertinent to the execution, performance and default termination of AEC's contract with the Navy, Kimmins and SSI served as agents for Cumberland to oversee and protect Cumberland's financial interest in the project (R4, sec. 2, tab K; tr. 5/175-76; ex. G-148(k))

Kimmins maintained individuals on the project to represent the bonding company's interest during the life of the contract (tr. 2/131). Those individuals served as project superintendents, one was an AEC employee, and two others had been Kimmins' employees, were selected by AEC with Kimmins' approval, but remained on the Kimmins' payroll to retain and protect their employee benefits. (Tr. 6/384-85; exs. G-41, -56, -93)

The record contains conflicting evidence regarding the extent to which SBA participated or assisted in the drafting of the language of the Agreement. Appellant's counsel at the time, through affidavit and testimony at hearing, stated that two former SBA officials, its contracting officer and regional counsel, in several meetings and other efforts at text revision, had helped him draft the Agreement, had concluded that the Agreement constituted nothing more than a subcontracting agreement and surety agreement not designed to deprive appellant of control over the project, and had approved the Agreement even though they felt that the Agreement was one made in the normal course of business and did not require SBA approval. (Ex. A-335; tr.12/19-21, 27, 90, 124) The two SBA officials testified that, while it was possible that appellant's then counsel discussed the Agreement with them, they neither drafted nor approved the Agreement, that they had a firm policy against approving or suggesting language for third party agreements, and that, in their opinion, the Agreement was not merely a subcontractor or surety agreement and that it violated the SBA regulations (tr. 11/38-43, 53, 153-54, 173, 181). Based upon the record and observing the witnesses' testimony at trial, we find that, while appellant's counsel discussed the contents of the Agreement with the SBA officials, the Agreement was never formally submitted to SBA for approval, the

SBA officials did not draft language used in the Agreement, and SBA and its officials neither formally nor informally approved the Agreement.

On 12 September 1989, Kimmins, by telecopier, forwarded the Agreement to the ROICC office in Orlando, addressed to the attention of CDR Cahill (ex. A-334; tr. 3/367). Although CDR Cahill had no recollection of having received the Agreement (tr. 3/405), Ms. Mary Steely (formerly Lundy), a contract specialist in the ROICC office, received it attached to appellant's Payment Request No. 1 (tr. 7/35), and it would likely have been given to CDR Cahill since he was the addressee (tr. 7/41). The Agreement was filed together with the payment request and would, therefore, been available for review by anyone in the ROICC office (tr. 7/42). Ms. Steely took note of the provisions of the Agreement, considered them to be unusual, but did not alert either CDR Cahill or legal counsel. She assumed that officials at SOUTHDIV were aware of the provisions of the Agreement. (Tr. 7/45-46, 53-58, 60-63)

The Navy withdrew its cure notice and issued Modification No. P00001 requiring the contract work to commence on 14 August 1989 and be completed by 12 December 1990 (R4, sec. 1, tab B).

Upon request by AEC to have progress payments deposited directly into the joint bank account, the Navy, by letter of 11 September 1989, provided AEC information to assist it in setting up the direct deposit. It advised AEC to send (a) a letter to the Navy Disbursing Office at Port Hueneme, California, authorizing that office to allow the Bank of America to accept AEC's check, and to include the name of the bank and account number to which the funds were to be transferred, (b) a letter to the Bank of America instructing that bank to transfer Navy disbursements to AEC's account, and to include the routing and numbers and an acknowledgment that there is a charge for each wire transfer, and (c) a copy of each of the letters to LT Gibbons and SOUTHDIV. The Navy also included copies of previous requests of that nature to aid appellant in preparing the required correspondence. (Ex. A-28) On 14 September 1989, AEC sent the letters to the Navy Disbursing office and to the Bank of America (exs. A-29, -30).

AEC prepared its performance schedule in the fall of 1989 with the assistance of Mr. George Robinson, a consultant who was formerly an employee of Kimmins. Mr. Robinson had extensive construction experience. The schedule was prepared using the critical path method (CPM). (Tr. 5/311-18, 6/8-9)

AEC paid SSI (a) $268,985.64 on or about 31 October 1989, and (b) $58,136.36 on or about 11 November 1989 for the performance and payment bonds (ex. G-2).

The AEC's and Kimmins' joint bank account was established through the Investment Management and Trust Division of Florida National Bank. The account yielded investment income which was not passed on to AEC. The account statements were sent to both AEC's Controller and to Mr. Joseph Williams at Kimmins. (Ex. G-22)

During performance, the standard Navy procedure to process progress payment requests is for the Government's construction representative, or inspector, to walk through the job site with the contractor's superintendent and to agree upon the percentage of completion of the project's schedule of values (tr. 2/136-37, 3/334, 5/47-48, 8/225-26). On this project, the parties usually did not perform a joint walk-through (tr. 3/183, 295-96). Generally, Mr. Farrah, the Navy inspector, after receipt of an AEC invoice, would walk the job site alone, would take notes of AEC's progress in narrative form with no estimated percentages of completion, and would provide those notes to AEC. AEC would then forward its invoice to the ROICC office together with Mr. Farrah's comments, and LT. Gibbons or someone else from the ROICC office would confer with Mr. Farrah before arriving at a percentage of completion upon which to base a progress payment and affording AEC an opportunity to comment on that percentage. Mr. Farrah would not permit subcontractors to take part in a walk-through. (Tr. 3/296-97, 7/302)

LT Gibbons was responsible for deciding how much, if any, of the progress payment request to disallow, and about 75 percent of the time that decision was based on observations made during his own walk-through of the site within the previous two weeks, in addition to Mr. Farrah's written comments. (Tr. 3/184)

From October 1989 through October 1990, the Navy made the following disallowances of AEC's payment requests:

| Req. No. | Amount Requested | Disallowance |
|---|---|---|
| 2 | $167,121 | $ 6,443 |
| 3 | 567,778 | 172,877 |
| 4 | 382,780 | 48,474 |
| 6 | 553,716 | 141,168 |
| 7 | 495,135 | 157,467 |
| 8 | 398,373 | 216,249 |
| 9 | 363,599 | 164,824 |
| 10 | 457,947 | 192,277 |
| 12 | 129,642 | 23,198 |

(Ex. A-282)

The Navy's disallowances were made because AEC's progress payments requests allegedly (a) included items for which work had not been performed, (b) included amounts in excess of that compensable for material stored on site but not yet in place, and (c) included items which were not performed in accordance with the contract requirements. (Tr. 2/145-46, 148-49, 3/184-85, 187, 331-33, 7/229-30, 240-41)

By letter dated 24 January 1990, LT Gibbons advised appellant that some of its construction activities had fallen behind schedule, stated that he was concerned notwithstanding appellant's forecast of an early completion, and requested that appellant advise the Navy in writing of "any significant occurrences" which may cause it to fall behind its anticipated completion date. (R4, sec. 1, tab E) AEC responded by letter of 30 January 1990, in which it indicated that it was still optimistic for an early completion in August or September 1990, but warned that because of invoice reductions as a result of "ultra conservative" inspector Mr. Farrah, subcontractors were beginning to "slow down" their work (R4, sec. 1, tab F; tr. 5/52).

During 1990, appellant experienced problems with its subcontractors, including subcontractor performance problems, subcontractor defaults, and subcontractor notices of nonpayment, (exs. G-32, -40, -54, -55, -59, -60, -61, -63, -64, -150).

In a memorandum dated 16 April 1990, appellant's project manager notified the Navy that appellant "wished to accelerate the contract" and would be working on weekends when necessary. He also advised that appellant would "staff the project with a C.Q.C., Superintendent and project manager at all times when work is in progress" (ex. G-34).

By letter of 30 May 1990, LT Gibbons stated that the ROICC office was concerned with "numerous issues" which were "hampering contract management and perhaps job progress," and indicated the need for a meeting. Among the items listed were AEC's failure to correct construction compliance notices and subcontractor accusations of nonpayment. (R4, sec. 1, tab G)

Kimmins sent AEC an invoice in the amount of $5,000 for scheduling services performed by Kimmins for AEC. By letter to Kimmins of 29 May 1990, AEC stated that the amount charged was excessive and, "as a final attempt to resolve this dispute," AEC offered Kimmins $1,500 for all of the scheduling services until completion of the project. (Ex. G-46) Kimmins responded in a letter dated 4 June 1990. It rejected the AEC settlement offer, requested AEC to forward a check for the full amount of $5,000, and stated that Kimmins would "be pleased to provide [AEC] with the balance of scheduling services required" for the contract. (Ex. G-47)

The parties met on 3 July 1990 and, by letter of 10 July 1990, AEC's Mr. del Campo confirmed that he was making changes in the project management as a result of Navy dissatisfaction. The letter pointed out that appellant did not agree with the Navy's opinion of the previous AEC management, and further asserted appellant's problems with Navy management. (R4, sec. 1, tab H) Mr. Copeland felt that the Navy's CDR Cahill had requested the management changes for personal reasons. (Tr. 5/73, 10/18) CDR Cahill bore no personal hostility toward either appellant or its principals or personnel (tr. 3/322-23).

By letter of 6 July 1990, AEC objected to Kimmins that the latter had not included AEC's overhead in its payment of AEC's draw request for May 1990 and that Kimmins had based that deduction on Kimmins' assessment that the project was behind schedule, an assessment with which AEC stated that it disagreed. AEC further stated that it considered the Kimmins' unilateral decision to withhold part of the draw, if it were to recur, to be a breach of contract. (Ex. G-49)

In a letter dated 16 July 1990, Kimmins cited a number of lawsuits and notices of non-payments filed against Cumberland on the project, and stated that Cumberland was "very nervous" about that situation and the fact that AEC was "making monthly payments to the Subs and Vendors in excess of [AEC's] billings to the Navy." Calling this "a signal of a dangerous financial problem ahead," Kimmins asked AEC for a complete audit of the project and an update of the status of the lawsuits, and stated that the May overhead payment would be withheld until Kimmins received the updates. (Ex. G-51)

During July 1990, CDR Cahill retired, LT Gibbons was reassigned elsewhere, and Mr. Musser took over as the Navy's project manager to maintain continuity on the project. Beginning the following month, Navy disallowances of AEC payment requests were "nominal." (Tr. 2/14-15, 3/391) The Navy attributed the decrease to the change in AEC's project manager; AEC attributed the improvement to the change in Navy personnel assigned to the project.

By bilateral contract modifications, the contract completion date was extended to 23 December 1990 (R4, Sec. 1, tab B; tr. 1/118-22).

When Mr. Musser became the Navy's project manager in July 1990, he was concerned about the pace of AEC's performance, although he did not perform a written schedule analysis (tr. 2/215, 3/22). By letter to AEC of 1 August 1990, Mr. Musser warned that, although AEC's schedule indicated that it would complete performance a week before the scheduled completion date, AEC had completed "very few" of its activities within its "planned durations," and any delay to critical path items could result in performance beyond the completion date and the imposition of liquidated damages

(R4, Sec. 1, tab I). Appellant responded by letter of 9 August 1990, stating, among other things, that, although it was concerned with the consumption of the float time in its schedule, it was pursuing the project vigorously and was confident of a timely completion if the parties could work together to resolve outstanding issues (R4, Sec. 1, tab J).

On 19 September 1990, Mr. Musser sent AEC a letter advising that, based on appellant's 10 September 1990 progress schedule, it appeared that AEC was 102 days behind schedule and would not be able to complete performance until approximately 1 February 1991. He again warned of potential liquidated damages and directed appellant to provide a "plan" on how it intended "to adjust [its] performance in order to finish by the contract completion date." (R4, sec. 1, tab K) Although Mr. Musser was fairly confident that appellant would not complete work by 23 December 1990, the Navy did not issue an acceleration order or an official cure notice (tr. 2/222). The user of the facility did not express to Mr. Musser any sense of urgency with regard for needing the new facility, so Mr. Musser did not consider terminating the contract for either default or convenience and saw no problem in AEC performing until February 1991. AEC was making some progress, the Navy accepted the benefit of the work and encouraged AEC to continue performance. (Tr. 2/224-26)

By letter to appellant dated 24 October 1990, Mr. Musser summarized previous discussions and advised appellant that, based on its progress schedule of 15 October 1990, appellant was 99 days behind schedule and that, without working on holidays or weekends, it would complete performance on 6 March 1991. He further wrote that, although appellant had represented that it had a bar chart to reflect a plan to complete performance by 23 December 1990, as a result of a job "walkthrough" by Navy and AEC personnel, the ROICC had suggested that AEC prepare a realistic bar chart to reflect remaining performance activities with realistic completion dates, which the ROICC would compare to performance every two weeks. The letter also stated that "AEC's failure to maintain the revised schedule would result in the retention of potential liquidated damages on future invoices." (R4, sec. 1, tab L) At that time, Mr. Musser's opinion was that there was a good chance that appellant could not complete performance by 6 March 1991, but he did not order appellant to accelerate performance and did not issue a show cause order or consider terminating the contract for default (tr. 2/228, 230-32).

CDR Cutler became the ROICC in October 1990, and it was his opinion that AEC's rate of progress from that point to the end of the year was significantly slower than he had observed on other projects of a similar dollar value (tr. 1/40).

Although the Navy's inspector, Mr. Farrah, indicated on appellant's Progress Payment Requests Nos. 12 and 13, for work performed through 31 October 1990, that

AEC was behind schedule, the Navy did not withhold a retention for failure to make progress (ex. A-282).

The procedure established for direct deposit of progress payments from the Navy, through the Bank of America, into the joint bank account was carried out, apparently with no significant problems, until November 1990 (tr. 4/408). On or about 7 November 1990, the Bank of America attempted to transfer $106,414 to the joint custodial account, but was advised that the account number of that account was no longer viable because the Florida National Bank had merged with the First Union Bank. Thereafter, an employee of the Bank of America called AEC, spoke to an employee of AEC, who mistakenly provided the account number of the AEC regular corporate account rather than the joint bank account. As a result, the Bank of America wired the funds to AEC's regular corporate account. (Tr. 5/220-23, 9/10-11; ex. G-27)

Upon discovery that the funds had been placed in the wrong bank account, AEC did not transfer them to the joint bank account. Rather, it stated that it used the funds to pay overhead on this contract. However, since the funds were never placed into the joint bank account, Kimmins and Cumberland did not accept appellant's explanation that the funds were misdirected by innocent error, and they accused AEC of stealing the funds. AEC felt that it had provided adequate documentation that it had expended the funds on this contract. (Tr. 5/220, 223, 9/10-11)

During the time period from the end of November 1990 into January 1991, the Navy issued unilateral change orders for additional work, which increased the contract price and stated that the adjustment was "pending negotiation for time and money." That additional work included electrical work. (R4, sec. 1, tab B)

The parties met at the site on 6 December 1990 and discussed the items of work which remained to be performed. CDR Cutler, the Navy ROICC, understood from the discussion that contract performance could extend into April 1991, and asked AEC to document any requests for time extensions. In discussing the apparently less than full effort by some subcontractors, Mr. del Campo blamed delays in payment to subcontractors due to delays by the bonding company. That meeting was the first time that the ROICC became aware that AEC was having financial difficulties on the project. (R4, sec. 1, tab Q; tr. 2/101-02)

By letter to the ROICC dated 19 December 1990, appellant presented a "preliminary" list of items in which "time extensions appear to be warranted" (R4, sec. 1, tab N).

On 27 December 1990, the ROICC responded to the 19 December 1990 letter and stated that AEC's letter did not provide documentation for the time extension request. The ROICC further stated that, since AEC had passed the contract completion date, "potential liquidated damages" for 15 days "will be held on [AEC's] current invoice," and that AEC's failure to provide substantiation for requested time extensions by the next invoice would result in "additional potential liquidated damages being held." (R4, sec. 1, tab O)

By letter of 31 December 1990, CDR Cutler issued AEC an order to show cause why the contract should not be terminated for default. The letter cited the passage of the 23 December 1990 contract completion date, AEC's slow progress, its workforce level, and its "less than satisfactory on-site management and less than acceptable quality of workmanship." (R4, sec. 1, tab P)

Appellant responded to the show cause order by letter dated 10 January 1991. It confirmed a telephone conversation with CDR Cutler in which the parties agreed to meet on 23 January 1991, at which time AEC would present a revised CPM schedule establishing a new completion date and indicating how AEC was delayed through no fault of its own. (R4, sec. 1, tab R)

AEC requested Kimmins to perform the schedule analysis and Kimmins hired Mr. George Robinson, a consultant and former Kimmins employee who had prepared AEC's original schedule, to travel to the site to accomplish the task. Mr. Robinson, who had extensive experience in construction estimating and scheduling, spent three weeks at the site and expended 200 hours in the analysis. He observed the site, examined the drawings and specifications and other contract documents and correspondence. He interviewed AEC, Navy and subcontractor personnel. His analysis, known as a CPM "time impact analysis," consisted of an examination of events under the contract in three-month segments, and he concluded that there had been substantial Government caused delay and, as a result of those delays, he forecast completion of the contract on 16 April 1991. (R4, sec. 1, tabs S and T; tr. 3/333-36, 5/311-60)

AEC, by letters dated 22 January 1991, forwarded the Robinson analysis to the Navy in advance of the meeting and requested a contract time extension until 16 April 1991. (R4, sec. 1, tabs S and T)

The parties, as well as Cumberland and SBA representatives, met on 23 January 1991 and Mr. Robinson presented his analysis. The Navy, which did not have an opportunity to review the Robinson analysis in depth before the meeting, noted that it reflected only delays allegedly due to Government responsible causes, and asked AEC

to submit documentation in support of the conclusions of Government caused delay. AEC stated that it would do so.

Appellant's presentation at the 23 January 1991 meeting indicated to the Navy that appellant anticipated being able to complete the project by 16 April 1991, but the Navy realized that contract modifications issued subsequently could affect appellant's forecast for completion. In fact, CDR Cutler advised appellant that a modification involving additional telephone and electrical receptacles would be issued and would include a time extension; the Navy unilaterally issued Modification No. A00029 on the same date to accomplish that additional work. (R4, sec. 1, tabs B, W; tr. 1/146-51, 2/263-64)

Also at the 23 January 1991 meeting, Cumberland stated that its primary goal was to see AEC complete the contract and requested that the Navy not withhold liquidated damages. CDR Cutler asked the bonding company to provide the ROICC with a letter indemnifying AEC for the Navy not to withhold "potential liquidated damages on all future progress payments." Cumberland agreed to pay some of AEC's suppliers and subcontractors and the ROICC agreed not to assess liquidated damages at that time. The Navy made annotations on AEC's invoices that liquidated damages were not being withheld due to the agreement. CDR Cutler stated that, if progress continued to slip and/or the project finished late, he reserved the right to later assess liquidated damages and the surety also reserved its rights. At the close of the meeting, AEC reaffirmed its commitment to complete the contract and, in anticipation of the next "invoice walk through" scheduled for 12 February 1991, the parties agreed to conduct a "joint progress walk through" in the afternoon of 11 February 1991. (R4, sec. 1, tabs W, Y; tr. 1/47; exs. A-187, -282)

While CDR Cutler understood that AEC was forecasting 16 April 1991 as the completion date and he felt that it was a reasonable prediction with the utilization of a full work force (tr. 1/50-51), the Navy did not issue a contract modification formally establishing 16 April 1991 as the contract completion date.

By letter of 31 January 1991, AEC submitted to the ROICC additional information regarding the fire loop, storefront, and cold water insulation issues which, it had alleged, contributed to the project delay. AEC also stated that further information was forthcoming (R4, sec. 1, tab V). The ROICC responded by letter of 20 February 1991, requesting appellant to provide a date by which it would submit documentation on the other "delay issues." He stated, further, that his office would not be providing a response to the delay issues until all of the documentation for all issues was received. (R4, sec. 1, tab Z)

In late January and early February 1991, there was a disagreement between AEC and Cumberland regarding payments owed to subcontractors and whether there was money available in the joint bank account to pay them. Cumberland also took the position that it was not responsible for providing AEC with CPM scheduling services and that it was therefore also not responsible for delays in payments from the Navy resulting from the absence of such schedules. (Exs. G-69, -72, -73, -74, -75, -76, -78, -79, -86, -87)

During the same time period, AEC, Cumberland and the Navy received letters regarding alleged nonpayment of subcontractors (exs. G-68, -81, -150).

Appellant continued to perform work during February 1991, although the crew sizes of subcontractors were at somewhat lower levels than they had been previously (exs. A-283 -284, G-4, -13).

On 5 February 1991, AEC gave the Navy a revised schedule based on its CPM analysis projecting completion of the project on 26 April 1991 (ex. A-285).

On 8 February 1991, the Navy's Mr. Musser provided AEC a proposed agenda for the scheduled meetings on 11 and 12 February 1991. The schedule included time to negotiate contract modifications. (Ex. G-80)

On 11 February 1991, the ROICC and representatives of AEC and Kimmins walked through the job site and the parties met on the following day. They discussed various work items and CDR Cutler stated that contract modifications, including time extensions, were being prepared and would be issued shortly. (Tr. 6/342; ex. G-83)

By letter to AEC of 15 February 1991, Kimmins stated that the $106,000 which had been placed in AEC's general corporate account rather than the joint bank account was not an advance by the Navy and was not used to pay costs associated with this project. The letter referred to the matter as appellant's "diversion of funds" and stated:

> The Kimmins Contracting Corp. expects the AEC Corporation to repay in full the $106,000.00 which the AEC Corporation directed the Navy to fund directly into their account, bypassing the joint escrow account.

(Ex. G-85)

By letter of 22 February 1991, a copy of which was sent to Cumberland, CDR Cutler advised AEC that, as a result of the parties' meeting on 23 January 1991 and their

11 February 1991 job walk-through, he had decided "not to continue termination for default proceedings." The letter also stated:

> Our office will closely monitor your progress based on the revised schedule provided to us in February. Your failure to maintain satisfactory progress may result in a decision to reinitiate default proceedings.

(R4, sec. 2, tab A)

At that time, CDR Cutler had focused on 26 April 1991 as a realistic contract completion date (tr. 1/165-66).

The parties, along with Mr. Joseph Williams, representing Cumberland, met at the site on 4 and 5 March 1991. On the latter date, CDR Cutler asked why progress on the job was slow. AEC's Mr. del Campo replied that money and other factors were delaying the project. CDR Cutler stated that AEC was "close to being defaulted," and Mr. del Campo stated that AEC might not be able to absorb the losses on the project. Mr. del Campo also complained about Kimmins' refusal to release funds. Mr. Williams replied that AEC had failed to provide the proper paperwork to Kimmins. (R4, sec. 2, tab C) CDR Cutler's statement that AEC was close to being defaulted was intended to get AEC's attention and to get AEC and the bonding company to work together to complete the project (tr. 1/173-74).

Upon hearing that CDR Cutler had stated that AEC was "close to being defaulted," Mr. Williams reported it to Kimmins' Mr. Mackowiak and, on 6 March 1991, both men telephoned CDR Cutler to confirm that CDR Cutler had been serious when he made the statement. Mr. Mackowiak indicated that a default termination would be "unconscionable," especially in view of the pending contract modifications, and CDR Cutler responded that a default termination was only a potential action under consideration. (Tr. 6/345-47)

During March 1991, AEC traded a substantial number of acrimonious and accusatory letters with Kimmins, Cumberland and SSI. Among the issues in which they disagreed were (a) the placement of the $106,000 into the wrong bank account, (b) whether Kimmins was wrongfully withholding money owed to subcontractors, (c) whether AEC owed Kimmins for the salary of its project manager, and (d) whether Kimmins was interfering with AEC's performance. Among other things, SSI alleged that AEC had breached the Agreement and was in a position of default in the contract with the Navy, and it threatened to intervene and to take over contract performance. (R4, sec. 2, tabs, D, F, H; exs. G-93 to -98, -102, -103, -108, -109, -110, -113, -114, -117 to -119)

AEC requested ROICC assistance in resolving those disputes, but the Navy position was that the matter was one between AEC and the surety (R4, sec. 2, tabs E, G).

By letter of 20 March 1991, CDR Cutler wrote to AEC, as follows:

> As a result of the show cause meeting on 23 January, 1991 and subsequent job site walk through on 11 February, I informed you that I would not continue to pursue termination for default. My decision was based upon assurances from you that you would diligently pursue the completion of the contract with a revised completion date of 27 April, 1991.
>
> After more than 30 days, work in place continues to progress at a dangerously low pace. Productivity, measured by the number of work force man-hours, has decreased from approximately 150 to less than 100 man-hours a day. At that rate, you will not be able to complete the contract by 27 April 1991.
>
> You are notified that the government considers your failure to diligently pursue completion a condition that is endangering performance of the contract in accordance with its terms. Therefore, unless such a condition is cured within 10 days receipt of this letter [sic], the government may terminate you for default in accordance with FAR clause 52.249-10, default (Fixed Price Construction).

The Navy sent a copy of the letter to Cumberland and to the SBA. (R4, sec. 2, tab I)

By letter of 26 March 1991 to the ROICC office, appellant submitted a proposal to perform additional clearing and grubbing that had been requested by the Navy; the Navy had requested a "bottom line cost." The amount of the proposal was $32,833 and no additional performance time was requested. (Ex. A-219).

In January through March 1991, appellant's total employee and subcontractor work days were 703 in January, 436 in February, and 377 in March (ex. G-4).

By Modification No. A00032, signed by AEC on 27 March 1991 and by the Navy on 5 April 1991, the contract price was increased for the work necessary to insulate cold

water lines, and the contract completion date was extended from 23 December 1990 to and including 22 January 1991 (R4, sec. 1, tab B).

On or about 1 April 1991, AEC filed suit in Florida against Kimmins, Cumberland and SSI (ex. G-148(k)).

On 2 April 1991, appellant wrote to one of its subcontractors in response to its requests for payment, and attributed AEC's possible inability to pay to its disagreement with Kimmins regarding the availability of funds in the joint bank account. AEC reminded the subcontractor of its rights under the Miller Act to recover funds, and advised that its "bonding company agent" was SSI. (Ex. G-120)

On 3 April 1991, AEC wrote to Kimmins, advised that if Kimmins "would release a portion of the retainage funds . . . the total money owed to subcontractors could be paid," and that Kimmins' refusal to allow AEC to use that money was "not in line with construction industry practice." The letter advised Kimmins that it had "seriously damaged the progress of this project and brought [AEC] to the brink of default." (R4, sec. 2, tab L)

On 3 April 1991, appellant wrote another letter to Kimmins, stated that it took exception to most, if not all the points raised by Kimmins in its "latest battery of letters," which "distort[ed] the facts and misrepresent[ed] the truth, and advised that AEC would "feel more comfortable if Kimmins directed all future correspondence to AEC's attorney at the time (ex. G-121).

On 3 April 1991, AEC replied to the Navy's "cure notice" of 20 March 1991. AEC stated that, following the parties' meeting of 23 January 1991, it appeared "quite reasonable" that the project could be completed by 27 April 1991, but that "the many changes and delays caused by the Government have made an April completion impossible." Appellant also cited interference and "financial blackmail" by Kimmins and Cumberland, and stated that "unless both Kimmins and Cumberland Casualty restrain from their present conduct and release the funds currently in said bank account, it is doubtful that AEC will ever be able to complete the project." AEC strongly urged the Navy to exert its influence to obtain a release of the funds. (R4, sec. 2, tab N) CDR Cutler understood from the letter that AEC wanted to complete the contract, but was unable to predict by when it could do so (tr. 1/192).

By letter of 4 April 1991, CDR Cutler responded to AEC's 3 April 1991 letter. He stated that he was unable to evaluate appellant's allegation, which CDR Cutler called "vague" and "not substantiated" that "the many changes and delays" caused by the Navy

made it impossible to complete the project in April. He directed appellant to provide a detailed response to substantiate the allegation by noon on 5 April 1991. He continued:

> In addition, my letter of 20 March 1991 requires that you cure the dangerously slow work pace within 10 days. You have not addressed this in your response. I strongly encourage you to address this issue.

(R4, sec. 2, tab O)

Appellant responded by letter of 5 April 1991, indicated that it did not understand CDR Cutler's failure to comprehend its response to the cure notice since the message was "clear," and it restated its position. It stated that it could not cure the deficiency stated in the cure notice because of Kimmins' and Cumberland's restrictions on the disbursement of funds from the joint account, that it could not "give any assurance as to when the project will be completed," and that the resultant "financial strain" was "aggravated by costs incurred as a result of delays and additional work caused by the government." Appellant continued:

> Your latest letter requests substantiation of this last point; however, due to the time constraints, we refer you to correspondence which we sent you in preparation for our meeting of January 23, 1991. Although some issues mentioned in that correspondence have been resolved others remain (most significant of which is the fire loop). We do not know the full impact of this delay and cannot, at this time, prepare a complete claim package for you. We have reserved our rights on this issue and will formulate a claim position as provided under the FAR once the full impact of the delay is known.

(R4, sec. 2, tab Q)

CDR Cutler understood that appellant was contending that Government actions had affected its performance schedule and that the delays referred to were generally the same as appellant had alleged in its letter of 19 December 1990 (tr. 1/155-58, 197-98).

On 5 April 1991, appellant also sent another letter, as follows, to CDR Cutler:

> This is to inform you that AEC Corporation has been forced to reduce our work force at the referenced facility to the CQC

> and the superintendent. We cannot continue to incur costs on this project given the financial restrictions being imposed on us by [Kimmins] and [Cumberland]. Specifically, Kimmins and Cumberland have refused to release any funds to AEC Corporation to cover our direct job costs for the last two months.
>
> We regret this action, but find that we have no other option. We request, again, that you use whatever influence you may have with Kimmins and/or Cumberland to persuade them to release the funds available in the joint escrow account.

A copy of the letter was sent to Cumberland, Kimmins and the SBA. (R4, sec. 2, tab P)

Upon receipt of appellant's 5 April 1991 letters, CDR Cutler was of the opinion that there was not much hope remaining that appellant could complete the contract, and it appeared to him that the Navy would "have to continue through the default process" (tr. 1/77). At that time, the personnel in the ROICC office were of the opinion that appellant was doing no further productive work (tr. 7/110-16). However, the Navy never performed either a written schedule analysis to determine by when appellant could complete the contract or a financial analysis to ascertain the means it required to do so (tr. 1/219-20, 3/123).

On 5 April 1991, Mr. Farrah, the Navy's construction representative, arrived at the site and was told by appellant's CQC that AEC's Mr. del Campo and Mr. Copeland had taken as-built drawings, the submittal and correspondence files and equipment, including the copy and FAX machines, from the AEC trailer office at the site. Mr. Farrah advised the CQC to write a letter to AEC demanding the return of the submittals and as-built drawings. By FAX of the same date, the CQC advised Mr. del Campo that, in order to perform his quality control work, he required the documents and equipment which had been removed from the site. Mr. Farrah informed Mr. Musser, the Navy's Resident Engineer, of the events, and appellant's CQC similarly advised Kimmins of what had occurred. (Exs. A-283, -284, G-23, -122)

On 8 April 1991, AEC disconnected its telephone at the site, but returned to the site its submittal files, correspondence files and one set of as-built drawings. It did not return the FAX or copying machine. (Tr. 7/258; exs. A-283, 284, G-23)

In preparation for a scheduled meeting between the parties which was scheduled to occur on 9 April 1991, CDR Cutler had Mr. Musser prepare a "show cause" letter to be handed to appellant at the meeting. It was prepared in advance in the event that appellant

would not be able to provide information at the meeting to indicate that it had cured the condition identified by the Navy's 20 March 1991 letter. In that way, lacking assurances that appellant could complete the contract, the Navy could "move to the next stage" and "speed up the process" to terminate appellant for default. (Tr. 1/91, 7/261-62)

Prior to the 9 April 1991 meeting, AEC's Mr. del Campo was under the impression that it was to be a progress meeting and had no idea of the scope of the meeting and of its attendees. The attendees at the meeting included (a) Mr. del Campo, (b) AEC's CQC, (c) CDR Cutler, Mr. Musser and Mr. Farrah from the ROICC's office, (d) Mr. Mackowiak from Kimmins and Mr. Williams representing Cumberland, (e) a representative from the SBA, (f) representatives from the user of the facility, and (g) representatives from the Navy's SOUTHDIV, including the contracting officer, Mr. Andrew Demos. (Tr. 8/299)

CDR Cutler began the meeting by informing AEC that certain adhesive it used in performance was not in compliance with the Buy American Act and was required to be removed. He raised the issue of the documents removed from the site and the disconnected telephone, and Mr. del Campo responded that the documents were returned, that the telephone had been disconnected accidentally when a CQC telephone was disconnected, and that he would have telephone service restored. (Ex. A-230)

At the meeting, the parties discussed and agreed upon the percentages in connection with work completed in March 1991 and discussed AEC's performance schedule. Mr. del Campo indicated that he was unable to address the performance schedule or to indicate by when AEC would complete work because of the monetary constraints placed upon the company. CDR Cutler stated that the "current [contract] completion date based on all known modifications would be 3 March 1991," but, with the "weeks of work" still required, he discussed a 7 June 1991 actual completion date. He inquired whether Cumberland would provide indemnification for "potential liquidated damages," which the Navy would have to hold absent an indemnification agreement, for the additional performance time to the 7 June 1991 date. Mr. Williams of Cumberland, confused because there was no "contractual" completion date set at that point, responded that he would have to obtain the advice of counsel. (Tr. 3/107, 110, 112-14, 6/355-57, 8/151-52, 305; ex. A-230)

During the 9 April 1991 meeting, CDR Cutler attempted to finalize a change order request for additional clearing and grubbing that was not included in the work scope of the original contract. CDR Cutler stated that all the Government could offer was $25,000 plus a 55-day time extension and advised AEC to consider the issue of liquidated damages in deciding whether to accept that offer. AEC did not agree to do the work at that price. (Tr. 6/203, 353; ex. A-230)

During the 9 April 1991 meeting, AEC contended that the fire loop repair remained an issue delaying the contract. CDR Cutler responded that the fire loop issue had been resolved on 8 March 1991 when the Navy accepted the pressure test and that the Navy was still awaiting a detailed cost breakdown from appellant. (Ex. A-230)

During the 9 April 1991 meeting, the parties discussed appellant's financial difficulties, and the Navy officials were aware that appellant was experiencing a cash flow problem. Cumberland indicated that, while it was not restraining appellant from meeting its financial commitments, the joint bank account was not available because of a a State required retention for subcontractors. The Navy did not ask AEC, Cumberland or Kimmins for an estimate of how long it would take them to resolve their dispute regarding the $200,000 retention, nor did the Navy give them a deadline by which to resolve the dispute. CDR Cutler did not ask appellant whether the release of the Government retention (at that time $52,000) and an infusion of cash within a certain period of time would enable the company to complete performance, nor did the Navy perform any written schedule or financial analysis in an attempt to ascertain that information. No one at the meeting asked AEC whether it would perform the remainder of the work under the contract and AEC never said it would not complete performance; the matter discussed was when it would do so (tr. 1/189, 219-220, 225, 3/108-09, 116-18, 5/263, 6/207, 209, 358, 8/304-07; ex. A-230).

At the conclusion of the 9 April 1991 meeting, CDR Cutler gave Mr. del Campo the letter he had prepared a day earlier and Mr. del Campo signed a copy acknowledging receipt. A copy of the letter was also given to the other attendees at the meeting. (Ex. A-230) The letter given to Mr. del Campo had not been signed by CDR Cutler (R4, sec. 2, tab R; tr. 8/312); it was, therefore, not official at that time (tr. 1/207-08). AEC received a signed copy of the letter on 11 April 1991 (ex. A-227). The 10-day period computed from 11 April 1991 ended on 21 April 1991, which was a Sunday.

The letter referred to the 23 January 1991 meeting, the 11 February 1991 walk-through, the Navy's "cure letter" of 23 March 1991, and AEC's letter of 5 April 1991 in which it indicated that it was unable to cure the deficiency. The letter continued:

> Since you have failed to cure the conditions endangering your performance under [the contract] as described to you in the Government's letter of 20 March 1991, the Government is considering terminating the contract under the provisions for default of this contract. Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of causes beyond your control and without fault and negligence on your part. Accordingly, you

> are given the opportunity to present, in writing, any facts bearing on the question to [CDR Cutler] within 10 days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exist. Your attention is invited to the respective rights of the Contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for default.
>
> Any assistance given to you on this contract or any acceptance by the Government of delinquent goods or services will be solely for the purpose of mitigating damages, and it is not the intention of the Government to condone any delinquency or to waive any rights the Government has under the contract.

(Ex. A-227) During the 9 April 1991 meeting, prior to delivery of the letter, there had been no mention of a possible default termination, and no discussion followed its delivery (tr. 4/396, 6/361, 8/301; ex. A-230).

Following the general meeting on 9 April 1991, CDR Cutler asked Kimmins' Mr. Mackowiak and Cumberland's Mr. Williams to stay for another meeting with just the three men in attendance (tr. 4/396, 6/361). He told them that it was the Navy's intent to terminate the contract with AEC for default and asked whether Cumberland would complete the work following the default termination. Mr. Willams responded in the affirmative and CDR Cutler told him that he would send Cumberland a copy of a sample takeover agreement within a few days. Mr. Williams also told CDR Cutler that Cumberland had made offers to AEC to enable it to complete the contract. Those offers, presented in the alternative and with conditions attached, included Cumberland's injection of $250,000 into the project, a loan of that amount with collateral and personal notes signed by the AEC owners and their spouses, and Cumberland taking control over the project with the owners and their spouses signing notes to cover any shortfall. Mr. Williams reported that AEC had neither accepted any of the offers nor had made a counter-offer other than to have Cumberland place more funds into the project and permit AEC to retain control without its owners signing personal notes, and that Cumberland had refused to advance funds on that basis. CDR Cutler asked how much time would be required to complete performance, and Mr. Mackowiak of Kimmins replied that he would have to review the schedule before committing to a completion date. (Ex. A-228) Shortly after the second meeting, Mr. Williams advised Mr. del Campo that the Navy was going to terminate AEC for default (tr. 8/314).

On or about 9 April 1991, CDR Cutler requested that his staff begin to prepare a recommendation to SOUTHDIV to terminate the contract for default (tr. 1/213). On or about 10 April 1991, Mr. Demos, the contracting officer, obtained from NAVFAC the authority to terminate AEC for default (tr. 5/252; ex. A-281).

On 10 April 1991, AEC wrote to Kimmins advising that the Navy had erroneously wired another progress payment to AEC's general corporate account and that AEC had transferred the funds to the joint bank account (ex. G-124).

On 11 April 1991, an attorney for a subcontractor under the contract wrote to AEC demanding immediate payment of funds due under the contract and also demanding a copy of AEC's surety bond (ex. G-125).

On 11 April 1991, the Navy's SOUTHDIV sent Cumberland a draft takeover agreement. The cover letter indicated that a default termination was "anticipated" being issued to AEC on or about 20 April 1991 "due to the contractor's failure to pursue the completion of work," and asked Cumberland for its "plan of action." A copy of the letter was sent to the ROICC office. (Tr. 5/277; ex. A-332)

By letter of 12 April 1991, AEC advised the SBA of the Cumberland conditional offers. AEC explained to the SBA that it could not agree to the Cumberland conditions, but that it had made its own offer which had been turned down by Cumberland. (Ex. G-128)

In a letter of 16 April 1991, Mr. Williams, on SSI letterhead, wrote to CDR Cutler, advised that SSI took exception to AEC's allegations of 5 April 1991 regarding the disbursement of funds, and continued:

> All available funds have been disbursed to subcontractors and vendors who have performed labor and supplied materials on the above referenced project pursuant to subcontractor requisitions.
>
> To our knowledge, there are not currently any funds available for release from the escrow account.

(Ex. G-130)

The contract's daily reports reflect, and we find, the following total workday staffing by AEC and subcontractors performing productive work on the project during April 1991:

April 1 --- 17
2 --- 11
3 --- 19
4 --- 23
5 --- 18
6 --- 6
8 --- 9
9 --- 10
10 --- 10
11 --- 9
12 --- 4
14 --- 4
15 --- 3
16 --- 3
17 --- 5

The final daily report was for 17 April 1991, but AEC and some subcontractors were at the site through at least part of 22 April 1991, the date of the default termination (tr. 7/327-29; ex. G-4).

On 17 April 1991, the Navy unilaterally issued a number of contract modifications in order to "tie up loose ends" prior to terminating the contract for default (tr. 7/139). One of those modifications was a deductive change for the roof plywood and another, Modification No. A00033, reduced the amount paid for electrical receptacles and extended the contract completion date from 22 January 1991 to 3 March 1991 (R4, sec. 1, tab B).

On 18 April 1991, the ROICC sent the SOUTHDIV contracting officer, Mr. Demos, a memorandum prepared by the Navy's Mr. Musser. The memorandum, which was accompanied by supporting material, requested that the contract be terminated for default "as the contractor has failed to maintain satisfactory progress and has indicated that the current lack of performance cannot be completed [sic]." Mr. Musser admitted that the second part of the sentence does not make sense (tr. 3/128-29). The memorandum indicated that AEC was 87 percent complete overall, 98 percent complete on drywall, 98 percent complete on electrical, 95 percent complete on HVAC, 95 percent complete on underground utilities, and 90 percent complete on plumbing, the building's major systems. It represented to the contracting officer that there were no labor violations at that time.

All of the factors upon which the Navy relied in terminating the contract for default were set forth in the written recommendation to terminate (tr. 3/130, 7/134-35). It did not highlight the fact that the 3 March 1991 completion date had been set retroactively and, despite appellant's earlier allegations and presentation alleging multiple causes of Government responsible delay, the memorandum cited only the fire loop as a cause of delay alleged by appellant. The SOUTHDIV contracting officer relied upon the ROICC to review and analyze any claims of Government-caused delay (tr. 5/270-71). (Ex. A-231)

The memorandum indicated that there was no known "special military or other urgency" concerning the project. A section discussing factors considered in determining whether to terminate the contract included the following:

> This contract is a reprocurement of a defaulted contract that was allowed to sit partially constructed for a couple of years due to nonavailability of funds. The large increase in reprocurement was a result of the state of disrepair, deterioration, and site unknowns at the time of award of the reprocurement contract. The urgency of this action is predicated on prevention of another deterioration for reprocurement as well as community public relations that may suffer as a result of a second default.

(Ex. A-231 at 20)

The memorandum recommended that reprocurement be accomplished "by means of a Surety-Takeover Agreement" with Cumberland. It represented that it would take eight weeks for the surety to complete the project following the takeover. That representation was not based upon any analysis of how long it would take to complete the remaining 13 percent of the work. Mr. Musser claimed that he had obtained the estimate from the surety, and simply included it in the recommendation to the contracting officer even though he considered it to be overly optimistic. (Tr. 3/136-38; ex. A-231)

On 19 April 1991, Mr. Williams, on SSI letterhead, wrote another letter to CDR Cutler which was very similar to his letter of 16 April 1991, except that it stated that SSI was taking no position on AEC's potential claims against the Navy and that AEC's "repeated attempts to make use of subcontractors retention monies currently held in the escrow account for purposes other than payment to vendors and subcontractors" was a violation of Florida law (ex. G-134).

At the close of business on 19 April 1991, ROICC's Mr. Musser notified NAVFAC that appellant had not responded to the Navy's show cause letter dated 8 April 1991 within the requisite 10 days. In doing so, he calculated the 10 days from the hand delivery of the letter at the meeting of 9 April 1991. (Ex. A-230)

By contract Modification No. P00037 dated 22 April 1991, Mr. Demos, the SOUTHDIV contracting officer, issued a decision terminating the contract for default effective that date "due to failure to make progress in the work and for default in performance." Appellant received the contracting officer's decision on the same day. (R4, sec. 2, tab S) In issuing his decision, the contracting officer was under the impression that appellant had not responded to the show cause letter within the 10-day period (tr. 5/274; ex. A-281). He also took into consideration the fact that AEC had no other contracts within SOUTHDIV and that AEC was "not essential to the Government Acquisition Program" (ex. A-281).

By letter of 22 April 1991, AEC responded to the show cause letter, which, it stated, it had received on 11 April 1991. It referred to its letter of 22 January 1991, which had alleged causes of delay, and subsequent correspondence on the issue. It identified the fire loop and storefront issues as the "primary reasons for delays." It also identified 11 other "secondary" issues, and stated that the Navy's refusal to consider compensable time delays for the issues had a "devastating" impact on AEC's financial strength. AEC "summarized" its job progress by attributing performance delay (a) between September 1989 and December 1990 primarily to the Navy, naming Kimmins as a "lesser" cause, and (b) from December 1990 forward to Kimmins and Cumberland's "restraints, demands, and harassment." Appellant also expressed surprise at CDR Cutler's "decision to issue the default letter" since AEC understood that it would have the opportunity to address the issues raised by the Navy in its show cause letter. (Ex. A-234)

By letter on 23 April 1991, CDR Cutler took exception to appellant's allegations regarding the date of its receipt of the show cause letter, and maintained that appellant had received the letter on 9 April 1991, thus rendering untimely appellant's response to the show cause letter. CDR Cutler did not discuss the substance of appellant's response, but stated that the default termination would not be rescinded. (Ex. A-235)

On 23 April 1991, AEC wrote to Kimmins and complained that, despite Kimmins' promise that it would provide an updated schedule to attach to the March invoice to be sent to the Navy, appellant had not yet received it (ex. G-135). Kimmins responded on 25 April 1991 that it could not prepare the updated schedule until appellant provided the percentages of completion of each construction activity (ex. G-136).

On 2 May 1991, the Navy and Cumberland entered into a takeover agreement for completion of the project (R4, sec. 2, tab V).

On 9 May 1991, appellant timely appealed the default termination.

Following the default termination and appeal, AEC and Cumberland continued to correspond in an adversarial manner over issues such as who was responsible to compensate subcontractors and vendors. AEC continued to blame Cumberland and Kimmins for preventing AEC from paying subcontractors and vendors and for causing the default termination, and Cumberland continued to assert its position that it was required to retain certain funds. (Exs. G-139, -140 to -146, -148(a) to -148(c)) AEC pursued a legal action against Cumberland, Kimmins and SSI in Florida State court, they agreed to arbitration, and ultimately settled the suit. As part of the settlement, AEC attempted to assign its rights in this appeal to Cumberland and AEC agreed to cooperate in its prosecution (exs. G-148(g) to -148(o)).*

Our findings below relate to items for which appellant was allegedly due a time extension, or otherwise adversely affected its ability to perform, at the time of the default termination.

<u>The Fire Loop</u>

The TS, in Section 02713, Exterior Water Distribution System, stated:

> 6.4 TEST AND INSPECTIONS:
>
> 6.4.1 All existing and new work constructed under this section of the contract specifications will be subject to visual inspection for faults, defects or leaks and any deviation or omissions must be corrected at once.
>
> * * *
>
> 6.5 TESTING PROCEDURES
>
> * * *

* We have concluded that the attempted assignment was in violation of statute (95-2 BCA ¶ 27,750).

> 6.5.3 Locating leaks in existing mains: Contractor shall "pin-point" any leaks in existing mains by means of an approved "LEAK DETECTOR" device as utilized by local utility companies, or by any other method as approved by the Contracting officer. Payment for locating leaks shall be on the basis of a change order to be negotiated with and issued by the Contracting Officer.
>
> * * *
>
> 6.7.3 Payment for locating leaks by use of a Leak Detector device or other approved means shall be on the basis of a change order to be negotiated with and issued by the Contracting officer prior to the start of work required.

The TS also included the following special provision, quoted in pertinent part:

> C22 . . . Contractor shall test and inspect all fire hydrants, valves, post indicator valves, connections, bends, piping, etc. in connection with the fire protection system installed on site. Repairs, if any are required as a result of test procedures, will be authorized by the Contracting Officer.

(Ex. G-16)

Paragraph C23 of the special provisions, which did not relate to the fire loop, dealt with known damage to the existing domestic water line and specifically required the contractor to "excavate" to ascertain the extent of the damage (ex. G-16).

When appellant bid the contract, it assumed that there were potentially some problems with underground work which had been previously performed by Harvesters, and that repairs due to unforeseen conditions would be treated as a change and compensated (tr. 3/261-62). However, it considered that, since the earlier work was presumably performed under Navy inspection, it was generally performed correctly (tr. 5/115, 8/186). Appellant included $5,300 in its proposal for the fire loop, which included only its anticipated costs of pressure testing the system, by using a leak detector as provided in specification section 6.5.3, and no money for excavation. Had its bid included the costs of excavation, it would have included at least $15,000 to $20,000 (approximately $10-$12 per linear foot) (tr. 5/44-45, 96-108, 117, 126-30, 353).

Appellant's 10 April 1989 letter containing the qualifications to its proposal stated that it would "not be held responsible for any existing underground utilities which are not correct or that have been damaged," and that any conflicts between "new" and "existing" work would be the subject of a contract modification (ex. A-5).

It is customary in the industry to test and inspect piping for leaks by using a leak detector rather than by performing extensive excavation (tr. 6/164-65).

The work to test the fire loop system was not originally on the project's critical path. In preparing the original schedule for AEC, Mr. Robinson included three months for the testing of the fire loop, ascertaining any problems, and making the necessary repairs. The schedule anticipated completion of the fire loop work by 9 November 1989. (Tr. 6/102-10)

Upon testing the fire loop, appellant discovered that there were leaks in the system. Upon later excavation and inspection, it determined that Harvesters had failed to comply with the contract requirements by: (a) using cast iron piping rather than ductile iron piping (tr. 5/347), (b) failing to weld joints (tr. 3/150), (c) failing to use standard pipe lengths (tr. 5/347-48, 6/195, 337-38), (d) omitting and incorrectly sizing and placing concrete thrust blocks (tr. 3/269-70, 5/348), and (e) laying portions of the pipe seven to eight feet below the surface rather than the appropriate depth of four to five feet (tr. 5/347). Because appellant expected to find the piping at the higher depth, it performed the excavation at a slower, more careful pace (tr. 3/352).

Because of test failures, in the fall of 1989 appellant's CQC representative recommended that the entire existing fire loop system be abandoned (tr. 7/316-17; ex. A-283 at CQC Report No. 60). Lt. Gibbons directed that AEC test the system in segments (tr. 3/263-64; ex. A-288 at RFI No. 18); any attempt to uncover and test the entire fire loop system at one time could not be done because it would cause the system to burst or pipes to "jump out" (tr. 3/269). AEC complied with the direction and, by the end of February 1990, the Navy paid it for 98 percent of the value of the work (ex. A-282, Progress Payment Request No. 6). Since the system had passed testing in segments, appellant placed paving over a portion of the fire loop.

In approximately August 1990, appellant tested the entire fire loop system at one time for connection to the water system, but it would not hold the test pressure, and appellant discovered that there were new leaks in the system. In order to repair system leaks, appellant had to excavate the piping, which sometimes required cutting through and removing asphalt that it had already laid. By letter of 18 January 1991, appellant advised the ROICC that the fire loop appeared to have become a critical item and was delaying completion of the project and that appellant might be requesting additional compensation

and a time extension. The Navy's ROICC directed that the entire system be excavated, pressurized and tested. Appellant did so and, after the necessary repairs were made, the fire loop system passed inspection on 8 March 1991. (Tr. 7/215-17, 8/245-46; exs. A-271, -284)

The ROICC accepted the fire loop and verified the acceptance in writing to AEC on 11 March 1991. The letter stated that appellant could commence backfilling and compaction operations and requested that appellant provide a detailed cost breakdown of the fire loop repair as soon as possible. (Tr. 2/59; exs. A-207, 283, 284) By Modification No. A00036, dated 18 April 1991, the Navy unilaterally paid appellant the direct costs of making the repairs, but included neither costs of excavation nor a time extension (R4, sec. 1, tab B; tr. 8/246).

The Robinson analysis indicated that the repairs to the fire loop system created delays on the critical path of performance, and caused appellant a total of 159 days of performance delay primarily in the last half of 1990 which, when combined with the effects of the storefront delay described below, would delay the overall completion date to 16 April 1991. We so find. (R4, sec. 1, tab T; tr. 5/363; ex. G-9)

Cold Water Insulation

During 1990 and early 1991, the parties disagreed as to whether the specifications required appellant to insulate cold water lines, but appellant followed the Navy direction and performed the work in the spring of 1990. The Navy finally agreed that the task constituted a change to the contract requirements. On 5 April 1991, the parties bilaterally agreed to Modification No. A00032 which increased the contract price by $15,887 and extended the contract completion date by 30 days from 23 December 1990 to 22 January 1991. The modification contained a release of time and money resulting from the cold water insulation work. (R4, sec. 1, tab B)

Roof Plywood

The contract specification, at section 06100, required roof plywood which was one-inch thick and fire-retardant (ex. G-16). Among the items listed in appellant's 10 April 1989 letter with its proposal qualifications accepted by the Navy was the substitution of less expensive ¾ inch fire retardant roof plywood, at $22 a sheet, for the specified one-inch fire retardant plywood. Neither appellant's original proposal nor its 10 April 1989 letter identified the roof plywood it intended to provide as CDX grade. (Tr. 3/246, 5/16-18, 8/184-86; exs. A-5, -6, -313) Appellant ordered the plywood and a significant amount of it was delivered to the site (tr. 8/240).

The Navy's Lt. Gibbons received appellant's plywood submittal on 30 October 1989 and returned it disapproved because it was of a CDX grade, which is inferior to that required by the specifications. However, due to a report he had received indicating the possible delamination of fire-retardant plywood at certain temperatures, Lt. Gibbons, by letter of 3 November 1989, asked appellant for an estimate for credit for the substitution of ¾ inch non fire-retardant CDX plywood in lieu of the specified plywood. At the time he made that request, Lt. Gibbons was aware that appellant had already made significant deliveries of the fire-retardant plywood. (Tr. 10/115; exs. A-37, -274)

On 5 April 1990, appellant submitted its cost proposal in the amount of $6,523, which included the costs of restocking the material. After the Navy's request for more information dated 11 May 1990, appellant resubmitted its request on 22 June 1990 and included a request for a time extension and delay damages for 35 days. (Tr. 5/28; exs. A-66, -81)

By Modification No. A00008 dated 1 May 1990, the Navy unilaterally took a credit, later contested by appellant, and reduced the contract price by $10,070. As of 11 January 1991, AEC stated that time was no longer an issue with respect to the plywood issue and, in fact, the Robinson analysis concluded that the plywood issue was not on the critical path, but was concurrent with the storefront delay. (R4, sec. 1, tab B; Contract Modification File; tr. 5/332, 6/36, 47; exs. A-209, G-66)

The Storefront

The contract specifications required a storefront which was to enclose the front of the building. The storefront was identified as being in the critical path in AEC's original baseline CPM schedule. (Ex. G-18)

Although the storefront specifications were written in the manner of performance specifications, they were written around the features of a system manufactured by a company named Kawneer. During negotiations, the Navy agreed to accept a system manufactured by Armalite, which contained some deviations from the specifications, but which cost approximately half as much as the Kawneer system. Appellant's 10 April 1989 letter containing its qualifications to its proposal reflected the Armalite system. (Exs. A-5, -6; tr. 3/246-47, 5/16, 18, 10/110-11)

Despite agreeing to the Armalite system, the Navy later insisted on a more expensive Kawneer system and finally suggested and accepted a third system, made by Ashley, which it had used at another facility (tr. 3/293-94, 5/16, 8/218-21). In the interim, however, while the Navy was attempting to reach a decision, there was substantial performance delay because, without the storefront, appellant could not enclose

the building, attain humidity control, and proceed with interior finishing work (tr. 8/222-23).

The Robinson analysis indicated that the work on the storefront was on the critical path of performance, and that the Navy's delay in making a decision had caused appellant 78 days of performance delay in the time period between October 1989 and January 1990 which, when combined with the effects of the fire loop delay, would delay the overall completion date to 16 April 1991 (R4, sec. 1, tab T; tr. 6/91; ex. G-9). We so find.

Floor Patching and Ceramic Tiling

The contract identified specific areas in which Harvesters had performed poorly with respect to the floor slab construction joints, and required appellant, at its option, to either grind the construction joints or to use a floor "underlayment" to achieve proper leveling. (Ex. G-16)

In February 1991, appellant submitted to the Navy a Request for Information (RFI) indicating that, after completing floor repairs in certain areas, it was still unable to comply with the specified tolerances for finish installation. It requested that the Navy review the specification and visually inspect the concrete floors which were to receive finished flooring to ascertain the nature of the problem. The Navy responded on the RFI as follows: "Perform floor repairs as required by contract – deficiencies will be evaluated only in areas that you have been required or have repaired." [Sic] (Ex. A-288, RFI No. 135)

At no time during contract performance did appellant identify floor patching or joint repair as a task which was delayed due to the fault of the Government (tr. 2/90). Although there is evidence that AEC had to perform more concrete floor patching than reasonably anticipated (tr. 5/365-66, 6/74), we also have evidence that some of the additional floor patching was due to damage caused by appellant (tr. 7/198-200).

The contract required a substantial amount of work in the repair and installation of ceramic tile. Contrary to appellant's allegations, there is evidence that the tile work was not dependent upon the completion of floor patching (tr. 4/185). The primary tile problem was the poor performance of the original tile subcontractor, which AEC terminated for default (tr. 2/60, 6/119, 7/265). The extent of that poor performance made rework even more difficult, which delayed the finish to the bathrooms, including the installation of fixtures (tr. 2/61).

Electrical Work

As we found above, the Navy issued unilateral contract modifications which, among other things, increased the amount of electrical work appellant was required to perform. The additional electrical work was on the critical path of performance and caused delay of 20 days to the completion date, and we find that drywall patching necessitated by the electrical work extended performance time and the completion date by an additional 10 days. (Tr. 4/320-21; exs. G-4, -23, A-283) We further find that those 30 days of delay would delay the overall completion date from 16 April 1991 to 16 May 1991.

Expert Evidence

The record includes expert analyses of appellant's contract performance and the impact of events upon that performance.

The Robinson analysis was prepared on behalf of AEC. It was a "time impact" CPM analysis, in three-month segments, of contract events occurring to January 1991, and was presented to the Navy in the meeting of 23 January 1991 (R4, sec. 1, tab T; tr. 5/322-25). Mr. George Robinson testified at the hearing, demonstrated considerable experience and expertise, and, although he was limited in the time period to perform his analysis (tr. 6/48-49), he was a very credible witness. The Robinson analysis recognized (a) causes of delay attributable to both AEC and to the Government (tr. 5/327, 339), (b) concurrent causes of delay which, ultimately did not result in overall performance delay because of other delay causes which turned out to be more critical at the time due to their duration (tr. 5/353-54, 359), and (c) contractor actions which mitigated performance delay (tr. 5/355).

The Robinson analysis concluded that appellant incurred performance delays on the critical path by the Navy's actions, omissions and delays due primarily to events regarding the storefront and repairs to the fire loop, and that those delays would have led to completion of the contract on 16 April 1991. We have so found. (R4, sec. 1, tab T; tr. 5/331, 337-38, 343-53; exs. A-285, G-9)

Mr. George Crowley of Warner Construction Consultants, Inc., also on behalf of AEC, used the Robinson analysis as a starting point and performed what he described as a CPM analysis of contract events occurring from January 1991 until the default termination in April 1991. While using data from the daily reports, the Warner report relied heavily upon interviews which Mr. Crowley conducted with only AEC personnel and which are not reflected in the record except through Mr. Crowley's hearsay recollections. Mr. Crowley did not interview Navy personnel.

The Warner report found that, in the period of 7 January 1991 through 8 April 1991, the critical path of performance included the fire loop repair delays and the floor patching and ceramic tile delays. It concluded that, but for Navy caused delays, AEC would have completed its work on the project by 30 April 1991 and that those delays resulted in a projected completion date of 13 June 1991. (Ex. A-289) Through cross-examination, it was demonstrated that the Warner report contains several factual errors and that it did not include a manpower analysis (tr. 9/313-58). Mr. Crowley also concluded that AEC experienced no delays due to slow payment to subcontractors (tr. 9/355), a conclusion which ignores much of the record for the time period covered by his analysis.

We find Mr. Crowley's testimony to be generally unpersuasive, the Warner analysis to be deficient, and rely upon neither in our findings and conclusions.

On behalf of the Government, Mr. Marc Watson, of Sverdrup Corporation, prepared demonstrative charts including a contract activity analysis for the period January through April 1991 (exs. G-3, -4). Mr. Watson's analysis is not a CPM analysis. Like Mr. Crowley, Mr. Watson used the Robinson analysis as his starting point. Mr. Watson's analysis compares the as-planned activity duration for each of several contract activities with the actual duration for the four-month period, and shows the staffing levels for each activity for each day of performance during the time period. (Tr. 4/61, 71, 87, 308; ex. G-4)

Mr. Watson also prepared a graph depicting the daily balances of the joint bank account during the months of January through April 1991 (ex. G-5). His testimony, while touching on contract performance difficulties, emphasized AEC's financial problems, which he tied to its deteriorating relationship with Kimmins and Cumberland and the retention of funds in the joint bank account. However, Mr. Watson did not identify specific amounts of delay attributable to AEC's financial difficulties and its disputes with its surety. Moreover, notwithstanding his attribution of primary responsibility to the surety for AEC's performance difficulties, Mr. Watson acknowledged that AEC was entitled to a time extension for the electrical work resulting from contract modifications issued in early 1991 (tr. 4/321).

In addition to his contract activity and financial presentation, Mr. Watson prepared a Report of Findings (ex. G-13). At the hearing, the presiding judge deferred a ruling upon the Navy's motion to admit the Report of Findings into evidence. We make that ruling below.

## DECISION

The sole issue before us is the propriety of the Navy's default termination of this construction contract. We discuss the merits following our ruling on pending motions.

### I. Motions

Motion to Compel Payment of Expert Witness Fees

At the commencement of appellant's discovery deposition of Navy expert Mr. Marc Watson, of Sverdrup Corporation, appellant's counsel agreed to pay Mr. Watson his hourly fee of $150. She later learned that Mr. Watson was charging the Navy $120/hour and she compensated him at that lower rate. The Navy has moved that we compel appellant to pay Mr. Watson the differential, which totals $240. Appellant opposes the motion and contends that it is not obligated to pay the Navy's expert at a higher hourly rate than he is paid by the Navy.

A party deposing the other party's expert is obligated to pay the expert a reasonable fee for time spent in responding to discovery. *Copy Data Systems, Inc.*, ASBCA No. 44058, 98-1 BCA ¶ 29,390. Under the facts presented, we have no reason to conclude that $120/hour is not a reasonable fee. It is not within our province to decide whether appellant's counsel's agreement to pay Mr. Watson the higher fee quoted was an enforceable contract between the two.

The motion to compel is denied.

Motion to Admit Government Expert's Report

As reflected in our fact finding above, Mr. Marc Watson, the Navy's expert, provided expert testimony and demonstrative charts reflecting his factual analysis that were admitted into evidence. The Navy also offered into evidence Mr. Watson's "Report of Findings" (ex. G-13) and, upon appellant's objection as to its admissibility, the presiding judge deferred ruling on its admission until consideration of the parties' arguments in their post-trial briefs (tr. 4/23).

Mr. Watson was qualified as an expert in (a) construction management, (b) construction financial management, and (c) construction scheduling. His Report of Findings contains a very selective narrative of the project history with heavy emphasis upon AEC's relationship with its surety and its resultant financial problems. It includes no analysis of causes of delay alleged by AEC to be the responsibility of the Navy. The Report of Findings also contains legal opinions on (a) requirements for a default

termination, (b) abandonment, (c) assignment, and (d) contract interpretation. Although Mr. Watson admits to lacking expertise regarding sureties (tr. 4/238), his report contains opinions on that subject and even recommendations regarding possible referrals of Cumberland and its associated companies for disciplinary action. The Report of Findings does contain some opinions within Mr. Watson's area of expertise and a few items of a factual nature (*e.g.*, work crew sizes), at least some of which are cumulative to facts contained in his demonstrative charts or his testimony.

Expert legal evidence on issues of law before us is not admissible. *Lockheed Corporation*, ASBCA Nos. 36420, 37495, 39195, 91-2 BCA ¶ 23,903. Evidence on legal issues is, *a fortiori*, not admissible where, as here, that evidence consists of the opinions of one who is not an attorney. Similarly, we have no interest in the opinions of a witness in other areas in which he has no expertise.

The admissibility of expert testimony is within our discretion. *See Milmark Services, Inc. v. United States*, 731 F.2d 855, 860 (Fed. Cir. 1984). Where evidence has both legal and factual content, it may be admitted for purposes of the factual content. While we have little use for Mr. Watson's Report of Findings, and have fully considered his testimony and accompanying demonstrative charts, we admit the Report of Findings for the limited purpose of opinions within his expertise and for facts which are not cumulative to those found elsewhere in the record.

Motion to Exclude Pleadings and Documents Related to Other Disputes

Appellant requests that we omit from the record state court pleadings and other documents involved in the disputes and litigation between it and Kimmins/Cumberland/SSI because the Navy has failed to prove that those disputes or AEC's relationship with its surety and associated companies were the cause of AEC's performance problems.

We do not agree. Regardless of our conclusions concerning the relationship between AEC and Kimmins, Cumberland and SSI and the impact, if any, of their disputes upon contract performance, the documents and pleadings relate, in substantial part, to performance of the contract and are relevant to the issues before us. They are admitted into evidence.

Motion to Exclude Testimony for Violation of the Sequestration Order

Upon request, the Board issued a sequestration order pursuant to Rule 615 of the Federal Rules of Evidence. That rule states, in part:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion.

Based upon differing recollections of AEC's former counsel and former SBA officials, the parties disagree as to the extent to which, if at all, SBA officials assisted AEC in drafting the Agreement. Initially, appellant offered into evidence the affidavit of its former counsel relating a summary of his meetings with SBA officials regarding the Agreement (tr. 8/202-11). The presiding judge did not admit the affidavit into evidence, but extended the proceedings to permit the former counsel as well as the SBA officials to testify. (The affidavit was later admitted during Navy counsel's attempt to impeach appellant's former counsel's testimony).

Prior to their testimony and prior to appellant's opportunity to interview them, Navy counsel showed the former SBA officials the affidavit of AEC's former counsel, discussed its content with them, and they discussed it with each other. Appellant contends that Navy counsel's conduct violated the sequestration order and that we should exclude the former SBA officials' testimony from the record.

Violations of Rule 615 are not limited to the presence of a witness in the courtroom, but may include a witness reading the transcript of testimony of other witnesses. *Miller v. Universal City Studios, Inc.*, 460 F. Supp. 984 (S.D. Fla. 1978), *rev'd on other grounds*, 650 F.2d 1365 (5th Cir. 1981); *See also United States v. McMahon*, 104 F.3d 638 (4th Cir. 1997). In examining the application of Rule 615, we have looked for the presence of prejudice and have examined the facts surrounding the alleged violation in light of the specifics of the sequestration order in question. *See Robert R. Marquis, Inc.*, ASBCA No. 38438, 92-1 BCA ¶ 24, 692 at 123,169-70; *Collins & Company*, ASBCA No. 23736, 81-2 BCA ¶ 15,189 at 75,158-59.

In this appeal, the sequestration order was general in nature and did not specifically address conduct outside the courtroom. The conduct allegedly in violation of the order involved showing as yet uncalled witnesses an affidavit (which was not evidence at that time) of another as yet uncalled witness. The contents of the affidavit were substantially more general than was his later testimony, and we conclude that no prejudice resulted from the disclosure. While the safer practice would have been for Navy counsel to have interviewed the former SBA officials and presented their testimony without showing them the affidavit, we conclude that, under the facts before us, the sequestration order was not violated.

Appellant's motion to exclude the testimony is denied.

## II. The Merits

The Navy terminated this construction contract for default due to appellant's alleged "failure to make progress in the work and for default in performance." The Navy later added other grounds to justify the termination.

In attacking the propriety of the default termination, appellant, among other things, contends that it was entitled to time extensions due to Navy actions and omissions regarding certain construction items under the contract. Based upon our findings above, we will first discuss those construction items before proceeding to examine their impact, as well as that of other issues, upon the default termination.

### Construction Items

#### 1. The Fire Loop System

Under the terms of the contract, AEC was to be paid the cost of repairs to existing systems, and appellant was required to test and inspect the fire protection system, including its underground fire loop system.

Appellant contends that it was entitled to a time extension for this item due to the extensive, unforeseen repairs required of the fire loop, the initial Navy direction that it test the system in segments, and the requirement that the Navy ultimately imposed that it excavate the entire fire loop to make the necessary repairs. Appellant also argues that the Navy possessed superior knowledge of the extent of the required repairs and that it failed to convey that knowledge to appellant.

The Navy points to the TS provision stating that existing and new work was "subject to visual inspection," and maintains that, since the fire loop was underground, appellant should have included the costs of excavation in its proposal. The Navy further points out that it accepted the fire loop on 8 March 1991, and that the system was, therefore, not a factor affecting performance as of the date of the default termination on 22 April 1991.

Our findings do not support appellant's contention that the Navy possessed superior knowledge regarding the state of disrepair of the fire loop system, and appellant is not entitled to a time extension on that basis.

The specification provision stating that existing and new work was "subject to" visual inspection can not reasonably be read as a requirement that the entire underground system be excavated and visually inspected. Our findings reflect that, in those areas

where excavation was required, it was clearly specified. We have also found that the specification included the specific method to be used for leak detection, and that the customary methods of testing and inspecting underground piping do not include excavation of an entire underground system. We are, therefore, unable to conclude, as does the Navy, that appellant's proposal should have reasonably included the costs and time required to excavate the entire fire loop system.

The record reflects that the deficient work performed by Harvesters on the fire loop required very extensive repairs, and that the performance of those repairs caused performance delay of 159 days. That delay was due, at least in part, to AEC's compliance with Navy directives first to test the system in segments and then, when additional leaks resulted from a test of the entire system, to excavate it in its entirety.

We conclude that, due to the unanticipated extent of repair required to the fire loop and the delay in completing those repairs, appellant, in addition to its direct costs of repair already paid, is entitled to a time extension for that work. That time extension is discussed below.

2. Cold Water Insulation

Our findings reflect that, for this additional work, the parties, on 5 April 1991, bilaterally entered into a contract modification which extended the contract completion date from 23 December 1990 to 22 January 1991. The modification contained a full release and there is no basis upon which to conclude that appellant is entitled to an additional time extension for that work.

3. Roof Plywood

We have found that, as of January 1991, appellant stated that time was not an issue with respect to the roof plywood, that it was not on the critical path, and that its performance was concurrent with that of the storefront. Appellant is, therefore, not entitled to a time extension for this item.

4. The Storefront

We have found that the storefront specifications were written based on the features of a brand named product, that the Navy agreed to accept a less expensive product, that it later required yet another, more expensive storefront, and that its decision-making process caused performance delay of 78 days.

Appellant is entitled to a time extension, which we discuss below.

5. Floor Patching and Ceramic Tiling

Our findings reflect that, while AEC may have performed more floor patching than it anticipated, the additional work was not established as having been the fault of the Navy nor a cause of performance delay. We also found that problems with the repair and installation of ceramic tile centered around the poor performance of AEC's first tile subcontractor, which it ultimately terminated for default. Appellant is not entitled to a time extension for these items.

6. Electrical Work

We have found that additional electrical work ordered by the Navy increased performance time on the critical path by a total of 30 days for the electrical and necessary drywall patching effort. Appellant is, therefore, entitled to a time extension of 30 days for this item.

Time Extensions

We have found, based upon the Robinson analysis, that performance delays caused by the Navy in connection with the fire loop and the storefront would have led to completion of the contract on 16 April 1991. We have also found that appellant is entitled to a time extension of 30 days due to the additional electrical work. Appellant is therefore, entitled to a time extension to 16 May 1991.

The Default Termination

A default termination is an extreme sanction, tantamount to a forfeiture, and it must be exercised carefully. *Devito v. United States*, 413 F.2d 1147, 1153 (Ct. Cl. 1969); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987). In order to sustain a default termination, the Government has the burden of proving, based upon a preponderance of the evidence, that the termination was proper.

The FAR clause 52.249-10, Default (Fixed-Price Construction) contained in this contract provides, in part:

> If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will ensure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor,

terminate the right to proceed with the work (or any separable part of the work) that has been delayed.

The clause provides the Navy with the default termination remedy where AEC either (a) fails to complete the work, or (b) fails to prosecute the work with the diligence to ensure its completion, with the existence of either event (a) or (b) determined with reference to the time of completion specified in the contract, including any time extension.

It is undisputed that AEC did not complete performance by the 23 December 1990 completion date, that the Navy did not terminate the contract at that time, and that AEC continued to perform beyond that date. The parties, in their briefs, expend considerable effort in debating whether the Navy, by its forbearance, waived that completion date and whether the waiver doctrine is available in this construction contract where the contractor is paid for work performed after the scheduled completion date.

However, the issue of whether the Navy waived the 23 December 1990 completion date is moot. The record reflects that, due to additional contract work, in the beginning of April 1991 the parties extended the contract completion date to 22 January 1991 and, on 17 April 1991, the Navy unilaterally further extended the contract completion date to 3 March 1991.

The Default clause provides the Government with the remedy of termination where the contractor "fails to prosecute the work . . . with the diligence that will ensure its completion." Whether there is satisfactory diligence, or progress, is determined by whether completion is ensured "within the time specified in this contract including any extension." The Navy has presented no evidence that AEC could not complete contract performance by the extended contract completion date produced by an appropriate analysis of the time extensions to which AEC is entitled. We conclude that the Navy's default termination for failure to make progress was improper.

A default termination may be sustained where it is justified by circumstances at the time of the termination, even if unknown at that time, regardless of whether the contract was actually terminated for another reason. *Joseph Morton Co., Inc. v. United States,* 757 F.2d 1273 (Fed. Cir. 1985); *Pots Unlimited, Ltd. v. United States*, 600 F.2d 790 (Ct. Cl. 1979). In the course of this proceeding, the Navy has contended that there are valid bases for sustaining its default termination other than that stated in the contracting officer's decision.

The Navy contends that the default termination was proper because appellant's actions constituted anticipatory repudiation of the contract. In support of that contention, it points to the AEC letter of 5 April 1991 in which it stated that it had been forced to

reduce its work force at the facility to only its CQC and superintendent and could not continue to incur costs on the project due to the financial restrictions imposed on appellant by Kimmins and Cumberland.

In order to constitute anticipatory repudiation or breach, there must be a "definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." *Corbin on Contracts, § 973*. The repudiation must reflect a clear refusal to perform or be an unequivocal expression of an inability to perform. *Beeston, Inc.*, ASBCA No. 38969, 91-3 BCA ¶ 24,241. It may consist of actions and other factors, in addition to statements of inability to perform, but the words or conduct must manifest "a positive, unconditional, and unequivocal declaration of fixed purpose not to perform the contract in any event or at any time." *Dinger v. Oler*, 117 U.S. 490, 503 (1886). There is no anticipatory repudiation or breach where the contractor's professed inability to perform can be overcome and the contractor expresses a willingness to continue performance. *Fairfield Scientific Corp.*, ASBCA No. 21151, 78-1 BCA ¶ 13,082, *recons. denied*, 78-2 BCA ¶ 13,429, *aff'd*, 655 F.2d 1062 (Ct. Cl. 1981).

We are unable to conclude that AEC expressed an unequivocal unwillingness or inability to perform. In the 5 April 1991 letter cited by the Navy, AEC indicated that it would have to reduce its work force, it pointed to a specific cause of its inability to continue to incur costs, and requested the Navy's assistance in alleviating that cause. We have also found that, in another letter to the Navy of that same date, AEC stated that, due to actions of its surety and the Navy, it could not predict by when it could complete the contract. Those statements are far from an unequivocal expression of an unwillingness or inability to perform.

The Navy also points to appellant's actions of 5 April 1991 as constituting abandonment of the contract. We do not agree. While there is evidence that appellant removed some equipment and files from the construction site on 5 April 1991, it returned most of what it had removed, and it provided an explanation for the removal. Further, we have found that appellant had personnel at the site until the date of the default termination. We are unable to conclude that AEC abandoned the project.

The Navy also now attempts to justify the default termination on the ground that, at the meeting of 9 April 1991, AEC failed to provide assurances that it could complete the contract. Our findings reflect that appellant attended that meeting under the impression that it was to be a progress meeting, and nothing in the Navy's minutes of the meeting reflect that it was out of the ordinary or that appellant was ever placed in a position where it failed to assure the Navy that it could complete performance.

The Navy contends that the termination for default should be upheld on the ground that AEC failed to fulfill its obligation to make timely and proper payments to subcontractors and suppliers. While there is evidence of subcontractor and supplier complaints regarding payments during the time period in which AEC and Kimmins were in dispute, there is no evidence of a specific subcontractor or supplier that was not ultimately paid or anything even approaching the evidence necessary to support a default termination on that basis.

The Navy asserts that the record, as a whole, supports the conclusion that appellant's performance failures, resulting in the default termination, were due to the lack of funding as a result of the actions of its surety and its associated companies. The Navy contends that "Kimmins/Cumberland/SSI took an active role in driving AEC into a default" and that they "reaped the benefits" of the project by (a) collecting a substantial bond premium, (b) earning money on the project by billing AEC for services, and (c) contracting to complete the project following the termination. The Navy has even alleged that it had long been the surety's plan to take control of AEC and take over the project. It asserts that "[i]f Kimmins/Cumberland/SSI could complete the work after the termination, there is no reason why they could not have worked with AEC to complete the work prior to AEC's termination." (Post Trial Brief at 119-20)

While there may be some merit to the Navy's allegations regarding the surety's intent, it can not plead ignorance of the extent to which the surety and its associated companies exercised control over AEC's contract performance. The Navy was provided with a copy of the Agreement contemporaneous with its execution, although, because of an apparent breakdown of internal communications, there is some doubt whether any Navy official above the level of contract specialist read it at the time. During contract performance, as well, the Navy was aware of the control exercised over AEC by the surety as well as of their disputes, and there is no contemporaneous evidence of any Navy effort to use its influence to resolve the disputes or, at least, to ease the acrimony to facilitate performance. The ROICC met privately with the surety's representative, advised the surety of the impending termination prior to notifying AEC, and solicited the surety to complete performance.

There can be no doubt that, under the August 1989 Agreement, Cumberland and its associated companies exercised substantial control over AEC's contract. There is reason to surmise that AEC's disputes with its surety played some role in causing its performance problems and, if we were to make the judgment based upon the extent of acrimony and hyperbole in correspondence, we would find that role to be substantial. In the absence of proof, however, there remains doubt as to the extent, if any, that those disputes delayed performance. We have concluded that causes for which the Navy bore responsibility entitled AEC to time extensions. Even if it were proven that delay for

which AEC and/or its surety were responsible was concurrent with delays for which the Navy was responsible, AEC would be entitled to the time extensions.

## CONCLUSION

We have determined that appellant was entitled to contract time extensions to 16 May 1991. The Navy terminated the contract for default on 22 April 1991, and the evidence includes no analysis that appellant would not have been able to complete performance by 16 May 1991. The default termination was, therefore, erroneous.

The termination for default was improper and is converted into a termination for convenience. The appeal is sustained.

Dated: 14 August 1998

RONALD JAY LIPMAN
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

ALAN M. SPECTOR
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 42920, Appeal of AEC Corporation, rendered in conformance with the Board's Charter.

Dated: 17 AUG 1998

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals

BRIEF FOR APPELLANT

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

99-1343

RICHARD J. DANZIG, SECRETARY OF THE NAVY,

Appellant,

v.

AEC CORPORATION,

Appellee.

APPEAL FROM A DECISION OF THE ARMED SERVICES BOARD OF CONTRACT APPEALS IN NO. 42920, BY ADMINISTRATIVE JUDGE RONALD JAY LIPMAN

DAVID W. OGDEN
Acting Assistant Attorney General

DAVID M. COHEN
Director

OF COUNSEL:

ELLEN M. EVANS
Trial Attorney
Department of the Navy
Naval Facilities
Engineering Command
Washington, D.C.

THOMAS A. COULTER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L St., N.W.
Washington D.C. 20530
Tele: (202) 307-0290

Attorneys for Appellant

September 13, 1999



EXHIBIT
7

BRIEF FOR APPELLANT

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

99-1343

RICHARD J. DANZIG, SECRETARY OF THE NAVY,

Appellant,

v.

AEC CORPORATION,

Appellee.

APPEAL FROM A DECISION OF THE ARMED SERVICES BOARD OF CONTRACT APPEALS IN NO. 42920, BY ADMINISTRATIVE JUDGE RONALD JAY LIPMAN

## STATEMENT OF THE ISSUE

Whether the Armed Services Board of Contract Appeals incorrectly vacated the United States Navy's default termination of a fixed-price construction contract by failing to assess the reasonableness of the Navy's decision in the context of the appropriate time period.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Appellant, the United States Navy, appeals from a decision of the Armed Services Board of Contract Appeals that overturned the default termination of appellee, AEC Corporation. The board determined AEC was entitled to time extensions beyond the date of termination. The board held that because the Navy had not analyzed whether AEC could complete the project by the extended completion date, its termination of AEC for failure to make

# United States Court of Appeals for the Federal Circuit

99-1343

Richard J. Danzig,
SECRETARY OF THE NAVY,

Appellant,

v.

AEC CORPORATION,

Appellee.

---

DECIDED: September 25, 2000

---

Before MICHEL, BRYSON, and GAJARSA, Circuit Judges.

BRYSON, Circuit Judge.

The dispute in this case arose when the government terminated its contract with AEC Corporation for default. The Armed Services Board of Contract Appeals ruled that the default termination was improper, and the government has appealed from that ruling. We reverse and remand for further proceedings.

I

In May 1989, the Navy awarded AEC a contract to complete the construction of a Naval and Marine Corps Reserve Training Center in Miami, Florida. The contract called for AEC to finish the work by October 14, 1990. By late 1990, it was apparent that AEC was behind schedule. AEC was having financial difficulties with its surety,



EXHIBIT 8

and those problems were delaying the progress of the work. A cure notice issued by the Navy in December 1990 led to a meeting between the Navy and AEC on January 23, 1991. At that meeting, AEC provided a schedule with a projected completion date of April 16, 1991. The Navy agreed not to terminate the contract for default if AEC continued to make progress according to that schedule. AEC subsequently submitted a revised schedule with April 26, 1991, as the completion date. The Navy accepted that revised schedule, although for reasons that are unclear from the record, the parties subsequently used the following day, April 27, 1991, as the projected completion date for the project.

In late February 1991, AEC's surety froze the project's bank account, and the number of workers doing productive work on the project began to decline. At a meeting on March 5, 1991, the Navy asked why the project was progressing so slowly. AEC advised the Navy that it was unable to make progress on the project because the surety would not release funds from the project's bank account. The Navy responded by stating that AEC was close to being terminated for default.

On March 20, 1991, the Navy sent AEC a letter containing a cure notice. In the letter, the Navy stated that its agreement at the January 23 meeting not to pursue termination for default was contingent upon AEC's diligently pursuing completion of the contract by April 27, 1991. Since the January 23 meeting, the Navy charged, "work in place continues to progress at a dangerously low pace." Based on the decreasing number of man-hours being devoted to the job, the Navy expressed concern that AEC would not be able to complete the project by April 27. The Navy therefore stated that it

considered AEC's "failure to diligently pursue completion a condition that is endangering performance of the contract" and advised that unless that condition was cured within 10 days, the Navy would consider terminating the contract for default.

AEC responded to the cure notice with a letter dated April 3, 1991. In the letter AEC explained that while it had previously appeared possible to complete the project by April 27, 1991, "numerous factors have prevented [the project's] scheduled progress." First, AEC claimed that "the many changes and delays caused by the Government have made an April completion impossible." Second, AEC complained that since January 1991 the surety had interfered with AEC and hampered its progress on the job by blocking the release of funds sufficient to enable AEC to pay its subcontractors and meet other project expenses. The "financial strangulation" by the surety, AEC stated,

> has progressed to the point of not only preventing AEC from meeting its April 27, 1991 completion date, it has made it impossible for AEC to predict an ultimate completion date at this time. As a matter of fact, unless [the surety and its affiliate] restrain [sic] from their present conduct and release the funds currently in [the project's] bank account, it is doubtful that AEC will ever be able to complete the project.

The Navy responded by letter the next day, stating that it could not evaluate AEC's response because AEC's contentions that burdensome changes and government-caused delays had made an April 27 completion impossible were vague and unsubstantiated. The Navy directed AEC to provide a detailed response to substantiate its allegations. The Navy added that the March 20 cure notice required AEC to cure the dangerously slow work pace within 10 days, and it "strongly encourage[d]" AEC to address the cure issue.

On April 5, AEC answered by stating that it "cannot cure the deficiency stated in your Cure Notice due to the restrictions that [the surety and its affiliate] have imposed on the disbursement of funds from the joint escrow account. Consequently we cannot give you any assurance as to when the project will be completed." AEC added that "[t]he financial strain of this action has been aggravated by costs incurred as a result of delays and additional work caused by the government." In response to the Navy's request for substantiation of the allegations regarding government-caused delays and changes, AEC responded that "due to time constraints, we refer you to correspondence which we sent you in preparation for our meeting of January 23, 1991." In a second letter dated the same day, AEC advised the Navy that it had reduced its work force at the job site to two supervisory employees because of the financial restrictions imposed by the surety.

The Navy called a meeting at the site on April 9, 1991, at which it gave AEC an unsigned letter directing AEC to "show cause" why the contract should not be terminated for default. The letter directed AEC to respond within ten days. AEC received a signed copy of the letter on April 11. During the following 10 days, AEC did not respond to the Navy's "show cause" letter, and throughout that period AEC had only a handful of workers on the job site.

On April 22, 1991, the Navy terminated the contract for default. The termination notice stated that the contract was being terminated "due to failure to make progress in the work and for default in performance." AEC responded by letter the same day,

expressing surprise that the Navy had terminated the contract without waiting for AEC's response to the show cause letter.

AEC appealed the termination. After the contracting officer denied the appeal, AEC appealed to the Armed Services Board of Contract Appeals, which held the termination invalid. The Board concluded that modifications and delays to AEC's contract performance attributable to the government entitled AEC to an extension of time, which changed the contract completion date to May 16, 1991. The Board further ruled that the Navy had presented "no evidence that AEC could not complete contract performance by the extended contract completion date [May 16, 1991] produced by an appropriate analysis of the time extensions to which AEC is entitled." Accordingly, the Board concluded that "the Navy's default termination for failure to make progress was improper." The Board also rejected the Navy's argument that AEC had breached the contract by anticipatory repudiation. Because AEC had not "expressed an unequivocal unwillingness or inability to perform," the Board concluded that it had not repudiated the contract and that the default termination could not be sustained on that ground. Finally, the Board rejected the Navy's argument that the default termination was justified because AEC failed to give the Navy assurances that it could complete the contract on a timely basis.

The government sought reconsideration. In its reconsideration motion, the government argued, inter alia, that the Board had used the wrong legal standard in determining that the Navy was unjustified in terminating the contract because of AEC's failure to make progress. The government argued that the Board had required it to

prove that it was impossible for AEC to complete performance in the time remaining. The Board responded that it had not applied that standard, but had applied the standard urged by the government, i.e., whether the Navy had a reasonable basis for concluding that there was no reasonable likelihood the contractor could perform the contract within the time remaining for contract performance. The Board explained that even though it had applied the government's proposed standard, it had found against the government. Because the Navy "had no reasonable basis to conclude that there was no reasonable likelihood that the remaining work could be performed within a required time for performance," i.e., by May 16, 1991, the date the Board determined to be the correct completion date in light of adjustments for government-ordered changes in the contract, the Board reaffirmed its holding that the termination for default was improper.

II

On appeal, the government renews its contention that the Board applied an erroneous legal standard to evaluate the propriety of the default termination. According to the government, the Board found the termination to be per se improper because the Navy (1) failed to anticipate that the Board would award AEC an extension of the contract completion date to May 16, 1991, and (2) failed to present evidence that AEC could not have completed performance by then.

We disagree with the government's contention. In its opinion on reconsideration, the Board expressly stated that it had required the government to show that it was reasonable for the Navy to conclude that AEC would be unable to complete the project

by what the Board found to be the proper completion date. The government acknowledges that to be the correct standard, see Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987), but suggests that while the Board articulated that standard, it did not faithfully apply it.

We are not persuaded that the Board mouthed one standard but applied a different one. The Board expressly found that the Navy could not reasonably have concluded that there was no reasonable likelihood that AEC could have completed the contract by May 16, 1991. We therefore reject the government's argument that the Board applied the wrong standard for evaluating the merits of the default termination decision.

We agree with the government, however, with respect to one of the alternative grounds it has raised on appeal. In response to the Navy's March 20, 1991, cure notice, AEC failed to give the Navy adequate assurances that it could complete the contract on a timely basis or even that it could continue to make progress toward completion. That failure, the government argues, justified the Navy's decision to terminate the contract for default. Because we agree with the government on that issue, we reverse the Board's decision and hold that the default termination was valid.

When the government has reasonable grounds to believe that the contractor may not be able to perform the contract on a timely basis, the government may issue a cure notice as a precursor to a possible termination of the contract for default. See Discount Co. v. United States, 554 F.2d 435, 438-39 (Ct. Cl. 1977) (government issued a cure notice when the contractor had done no substantial work during the construction

season). When the government justifiably issues a cure notice, the contractor has an obligation to take steps to demonstrate or give assurances that progress is being made toward a timely completion of the contract, or to explain that the reasons for any prospective delay in completion of the contract are not the responsibility of the contractor. See Tubular Aircraft Prods., Inc. v. United States, 213 Ct. Cl. 749, 750 (1977) ("Plaintiff's minimal performance efforts coupled with its perilous financial situation warranted the issuance of a cure notice. Thereafter, plaintiff's failure to advise the Government that corrective action would be taken in order to make performance at levels reasonably commensurate with contract requirements financially possible, justified the default termination."); Composite Laminates, Inc. v. United States, 27 Fed. Cl. 310, 323-24 (1992) ("When the government issues a cure notice, in order for a contractor to avoid default, a contractor must be able to provide adequate assurances to the government that it can complete contract requirements on time."); International Verbatim Reporters, Inc. v. United States, 9 Cl. Ct. 710, 723 (1986) (once the cure notice was issued to the contractor, "its failure to correct, explain or communicate with [the government] during the period what corrective action that would be taken, justified a termination for default"); Vatex America, GPOBCA No. 08-96, 1998 WL 750866 (Oct. 14, 1998); Twigg Corp., NASABCA No. 62-0192, 93-1 B.C.A. (CCH) ¶ 25,318, at 126,157 (Aug. 5, 1992); RFI Shield-Rooms, ASBCA Nos. 17374, 17991, 77-2 B.C.A. (CCH) ¶ 12,714, at 61,732 (Aug. 11, 1977).

The law applicable to a contractor's failure to provide assurances of timely completion is a branch of the law of anticipatory repudiation. See, e.g., Discount Co.,

554 F.2d at 441 (when the government was not assured of timely completion, the court could properly "rely upon cases involving abandoned or repudiated contracts"). At common law, anticipatory repudiation of a contract required an unambiguous and unequivocal statement that the obligor would not or could not perform the contract. See Dingley v. Oler, 117 U.S. 490, 503 (1886); Cascade Pac. Int'l v. United States, 773 F.2d 287, 293 (Fed. Cir. 1985). As the Restatement of Contracts has recognized, however, modern decisions do not limit anticipatory repudiation to cases of express and unequivocal repudiation of a contract. Instead, anticipatory repudiation includes cases in which reasonable grounds support the obligee's belief that the obligor will breach the contract. In that setting, the obligee "may demand adequate assurance of due performance" and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract. Restatement (Second) of Contracts § 251 (1981). The Uniform Commercial Code has adopted a similar rule for contracts involving the sale of goods. See U.C.C. § 2-609.

The law of government contracts has adopted that doctrine, expressing it as a requirement that the contractor give reasonable assurances of performance in response to a validly issued cure notice. See Tubular Aircraft Prods., Inc. v. United States, 23 Cont. Cas. Fed. (CCH) ¶ 81,327, at 86,619 (Ct. Cl. Trial Div. Nov. 29, 1976) (recommended decision) (citing the Restatement and stating that "parties are entitled to ask for reassurances when persons with whom they have contracted have by word or deed created uncertainty about their ability or intent to perform and they are entitled to treat the failure to provide such assurances as a repudiation of the contract"), approved

and op. adopted by court, id. at 86,610, 213 Ct. Cl. 749 (1977); National Union Fire Ins., ASBCA No. 34744, 90-1 B.C.A. (CCH) ¶ 22,266, at 111,855 (Aug. 23, 1989); Salzburg Enters., ASBCA No. 29509, 87-2 B.C.A. (CCH) ¶ 19,761, at 99,994 (Mar. 30, 1987). That rule, as the Restatement explains, rests "on the principle that the parties to a contract look to actual performance 'and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain.'" Restatement (Second) of Contracts § 251 cmt. a (quoting U.C.C. § 2-609 cmt. 1).

The Board rejected the government's contention that AEC's failure to give assurances in response to the cure notice justified the default termination. The Board, however, focused solely on the April 9 meeting and concluded that at that meeting the Navy had not asked AEC to give assurances of timely completion. To be sure, the government's briefs before the Board focused mainly on the April 9 meeting, but the briefs did refer to AEC's overall inability or unwillingness to provide assurances of timely completion, including references to AEC's April 3 and April 5 letters to the Navy. We therefore do not limit our analysis of the failure to give assurances to the April 9 meeting.

Based on AEC's performance during February and March 1991, the Navy had a reasonable basis for concern that the contract would not be completed by April 27, 1991, the completion date that AEC had projected on February 5 and presented to the Navy to avoid default termination at that time. The Navy was therefore entitled to issue a cure notice demanding a correction of the slow pace of the work or a satisfactory

explanation of how AEC planned to complete the work on a timely basis. The issuance of a cure notice was justified under the circumstances, even if the circumstances did not, at that point, justify a termination for default. See National Union Fire Ins., 90-1 B.C.A. (CCH) at 111,855 (noting that the "right to demand assurance need not spring merely from a performance or progress failure, but may be asserted whenever reasonable grounds exist to believe a breach will be committed").

AEC's response to the cure notice did not satisfy its obligation to provide assurances to the Navy that it could timely complete the contract. AEC did not dispute the Navy's assertion in its cure notice that at its current pace it would not be able to complete the contract by April 27. In fact, AEC's April 3 letter stated that "the financial strangulation" of AEC by its surety had prevented AEC "from meeting its April 27, 1991 completion date" and had "made it impossible for AEC to predict an ultimate completion date at this time." Moreover, AEC stated that unless the surety and its affiliate released funds in the project's bank account, "it is doubtful that AEC will ever be able to complete the project." When the Navy asked for a more specific response, AEC responded on April 5 with a letter in which it reiterated that "due to the restrictions that [the surety and its affiliate] have imposed on the disbursement of funds from the joint escrow account . . . we cannot give you any assurances as to when the project will be completed." Clearly, the April 3 and April 5 letters offered nothing to allay the Navy's concerns about AEC's ability to complete the contract on a timely basis.

At about the time of the April 3 and April 5 letters, AEC removed the contract files and office equipment from the work site and disconnected the telephone at the work-

site office. At the same time, AEC advised the Navy that it had been forced to reduce its work force at the facility to two persons and that it could not "continue to incur costs on this project given the financial restrictions being imposed on us by [the surety and its affiliate]." Finally, at the meeting between representatives of the Navy and AEC on April 9, AEC was given a notice to show cause within 10 days why the contract should not be terminated for default, and AEC failed to respond within the 10-day period.

AEC's conduct, like its responses to the cure notice, clearly failed to provide the requisite assurances that AEC would complete the project on a timely basis. Rather than providing an assurance of timely completion, AEC told the Navy, through both its words and its conduct, that the contract was not likely to be completed until AEC was able to work out its financial difficulties with its surety. AEC offered the Navy no reason to believe that those difficulties would be resolved any time in the near future. Moreover, although AEC makes some effort to suggest that its financial difficulties were the fault of the government, there is no finding by the Board to that effect and no evidence supporting that suggestion. Thus, there is no reason in this case to depart from the normal rule that the contractor's financial difficulties are not a legitimate excuse for its failure to make progress. See, e.g., TGC Contracting Corp. v. United States, 736 F.2d 1512, 1515 (Fed. Cir. 1984); Kennedy v. United States, 164 Ct. Cl. 507, 514 (1964); Howell Tool & Fabricating, Inc., ASBCA No. 47939, 96-1 B.C.A. (CCH) ¶ 28,225, at 140,941 (Feb. 29, 1996); Transdyne Corp., ASBCA No. 12834, 69-1 B.C.A. (CCH) ¶ 7615, at 35,371 (Apr. 2, 1969).

AEC's assertions of government-caused delay similarly did not respond adequately to the Navy's request for assurances. Although AEC referred to government-caused delays in both the April 3 and April 5 letters, it was not specific as to what changes had caused delay or how much delay it considered the government to have caused, nor did it represent that it could complete the contract within the additional time to which it believed it was entitled. In the April 3 letter, AEC simply made a blanket assertion that government changes and delays had been partially responsible for AEC's failure to adhere to the schedule it had agreed to at the January 23 meeting. In its April 5 letter, after being asked for more specificity on that issue, AEC simply referred to material it had provided to the Navy before the January 23 meeting, even though that meeting pre-dated the setting of the April 27 target date for completion of the project. Although AEC conceded that some of the issues referred to in the January 23 material had been resolved, it argued that other issues remained. Of the remaining issues, however, AEC identified only the fire loop around the building as a change that caused additional delay. On that issue, the Board found that the government-caused delay affected AEC's performance primarily in the last half of 1990, even before the January 23 meeting. AEC's responses to the cure notice thus did not adequately explain how its slow progress was the product of delay caused by the government or was otherwise excusable.

Under these circumstances, we conclude as a matter of law that AEC failed to respond adequately to the Navy's reasonable request for assurances of timely performance. The Navy was therefore entitled to regard AEC's failure to provide such

assurances as a breach of the contract justifying termination of the contract for default. On remand, the Board shall address the remaining issues of liability based on our holding that the default termination was valid.

REVERSED and REMANDED.